```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEVADA

 3

 4   MARK HUNT,                    ) Case No. 2:17-cv-85-JAD-CWH
                                   )
 5              Plaintiff,         ) Las Vegas, Nevada
                                   ) Monday, May 22, 2017
 6        vs.                      ) 1:57 p.m.
                                   ) Courtroom 6D
 7   ZUFFA, LLC, et al.,           )
                                   ) MOTION HEARING
 8              Defendants.        )
                                   ) CERTIFIED COPY
 9   _____)

10

11               REPORTER'S TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE JENNIFER A. DORSEY,
                   UNITED STATES DISTRICT JUDGE

13

14

15   APPEARANCES:

16   For Mark Hunt:

17          SCOTT J. INGOLD, ESQ.
            JOSEPH J. GONNELLA, ESQ.
18          Higgs Fletcher & Mack
            401 West A Street, Suite 2600
19          San Diego, California 92101
            (619) 236-1551
20   (continued next page.)

21

22   Court Reporter:        Felicia Rene Zabin, FCRR, RPR, CCR 478
                            United States District Court
23                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada  89101
24                          FZ@nvd.uscourts.gov

25   Proceedings reported by machine shorthand.  Transcript produced
     by computer-aided transcription.
```

———2:17-cv-85-JAD-CWH - May 22, 2017———

 1 | APPEARANCES CONTINUED:

 2 | For Zuffa, LLC, and Dana White:

 3 |         J. COLBY WILLIAMS, ESQ.
         DONALD JUDE CAMPBELL, ESQ.
 4 |         Campbell & Williams
         700 South 7th Street
 5 |         Las Vegas, Nevada 89101
         (702) 382-5222

 6 |

 7 | For Brock Lesnar:

 8 |         HOWARD LEE JACOBS, ESQ.
         Law Offices of Howard L. Jacobs
 9 |         2815 Townsgate Road, Suite 200
         Westlake Village, California 91361
10 |         (805) 418-9892

11 |         KENDELEE LEASCHER WORKS, ESQ.
         PETER S. CHRISTIANSEN, ESQ.
12 |         Christiansen Law Offices
         810 South Casino Center Boulevard, Suite 104
13 |         Las Vegas, Nevada 89101
         (702) 240-7979

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

```
 1            LAS VEGAS, NEVADA; MONDAY, MAY 22, 2017; 1:57 P.M.

 2                            --oOo--

 3                     P R O C E E D I N G S

 4            COURTROOM ADMINISTRATOR:  All rise.

 5            THE COURT:  Good afternoon.  Please have a seat.

 6            COURTROOM ADMINISTRATOR:  Now is the time set for a

 7  motion hearing in Case No. 2:17-cv-85-JAD-CWH, Mark Hunt versus

 8  Zuffa, LLC, et al.

 9            Counsel, please stated your appearances.

10            MR. INGOLD:  Good afternoon, Your Honor.  Scott Ingold

11  on behalf of the plaintiff, Mark Hunt.

12            MR. GONNELLA:  Good afternoon, Your Honor.  Joseph

13  Gonnella also for Mark Hunt.

14            MR. WILLIAMS:  Good afternoon, Your Honor.  Colby

15  Williams, Campbell & Williams, on behalf of defendant Zuffa,

16  LLC, and Dana White.

17            MR. CAMPBELL:  Donald Jude Campbell, Campbell &

18  Williams, on behalf of the defendants.

19            MR. JACOBS:  Good afternoon, Your Honor.  Howard Jacobs

20  for Defendant Brock Lesnar.

21            MS. WORKS:  Good afternoon, Your Honor.  Kendelee Works

22  and Pete Christiansen for Defendant Brock Lesnar.

23            THE COURT:  All right.  Please have a seat.  Good

24  afternoon, everybody.

25            We are here on two Motions to Dismiss, one filed by
```

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1   Zuffa and Mr. White and the other one filed by Mr. Lesnar.  For

2   the record, they are Documents 11 and 30 respectively in the

3   record.

4           I will let everyone know, first of all, I have read

5   every word of all of the very nicely prepared briefs.  I want to

6   thank all of you for the care and attention that went into those

7   briefs.  And, because I think everything was so well briefed, I

8   definitely don't need a reiteration of every argument and every

9   point raised.  I've spent a lot of time with these motions.

10  I've read all of the cases that are cited in them.  So I'm

11  prepared to hear what else or what else you would like to

12  stress.

13          But I also have a pretty packed calendar this

14  afternoon.  And so what I'm going to do is put some time limits

15  on this.  So it's going to be a bit like an appellate argument,

16  which I understand that everyone should be pretty comfortable

17  with anyway.  So I'm gonna give Zuffa and Mr. White -- so 10

18  minutes, Mr. Williams, for you.  10 minutes for . . .

19          Who is gonna argument on behalf of Mr. Lesnar?  Is it

20  going to be you, Mr. Jacobs?

21          MR. JACOBS:  Yes, it is, Your Honor.

22          THE COURT:  10 minutes for you.

23          And then I'm gonna give -- because it's primarily

24  overlapping arguments on that side, I'm gonna give you guys 15

25  minutes to respond.

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1          MR. INGOLD:  That's fine, Your Honor.

2          THE COURT:  Okay?

3          MR. INGOLD:  Thank you.

4          THE COURT:  If you want to reserve any of your 10

5    minutes for rebuttal, please let me know.

6          But, again, I will reiterate:  I have read everything.

7    I understand your arguments.  I've looked at all of the

8    documents.

9          And, Mr. Williams --

10         MR. WILLIAMS:  All right.

11         THE COURT:  -- the podium is yours, sir.

12         MR. WILLIAMS:  Thank you, Your Honor.  And I will heed

13   the Court's advice with respect to the fact that you've read

14   everything and keep my arguments focused.  I'd like to reserve

15   five minutes.

16         THE COURT:  So that gives you five to argue and five

17   for --

18         MR. WILLIAMS:  (Nods head.)

19         THE COURT:  Gotcha.  Okay.

20         MR. WILLIAMS:  Perfect.

21         THE COURT:  Go for it.

22         MR. WILLIAMS:  Your Honor, I'd like to begin very

23   simply with a quote from the Ninth Circuit in *Oscar v.*

24   *University Students Co-Op* and it's this, quote:  RICO was

25   "intended to combat organized crime, not to provide a federal

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1   cause of action and treble damages to every tort plaintiff."

2          Here, Mr. Hunt's Complaint is a prime example of the

3   overenthusiastic use of RICO and its specter of criminal

4   wrongdoing to seek a financial windfall in the context of a

5   routine commercial dispute.  And, while RICO has unquestionably

6   been stretched in scope and meaning beyond the organized crime

7   context, certain guiding principles remain no matter what the

8   subject matter is of the case.

9          The most fundamental of those requirements, Your Honor,

10  we would submit, would be that a plaintiff has to have RICO

11  standing under 18 U.S.C. 1964(c) and that's a two-pronged

12  inquiry.  First prong, you've got to demonstrate a cognizable

13  injury to a property or business interest.  And, Your Honor,

14  most respectfully to opposing counsel, that is not determined by

15  trying to squeeze yourself into some other interest that has

16  been found suitable for RICO injury in a prior case.  The courts

17  are unanimous when they tell us business and property interests

18  are a categorical inquiry based on state law.  The second

19  inquiry that must be established for RICO standing is that there

20  has to be proximate cause between the injurious conduct and the

21  claimed injury.  These are questions of law for the court; they

22  are proper for determination at the 12(b)(6) stage; and, if a

23  plaintiff fails to satisfy either prong, the RICO claim must be

24  dismissed.  We submit Mr. Hunt doesn't satisfy either one.

25          Now, Your Honor, I'm not going to go through all of the

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1  aspects of both prongs because, clearly, the Court has read it.

2  But I think there's one thing that permeates the entire case --

3  both RICO claims, state law claims, quasi-criminal claims have

4  been asserted, every single one -- and it is this:  Mr. Hunt

5  cannot show any financial loss; any concrete, tangible injury.

6  Period.  End of story.  He cannot do it.

7        Your Honor, I'm not gonna get into, unless the Court

8  has specific questions, about the fact that personal injury and

9  reputational harm is simply not recoverable under RICO.  It's

10  not.  The alleged lost opportunities that Mr. Hunt claims are

11  all in the future; they are all speculative; they are all

12  contingent.  None of which RICO provides a remedy for.

13        And, most importantly, Your Honor, he can't demonstrate

14  a property interest or a business interest.  He tries to in the

15  opposition, I think, mount more of a business interest; but even

16  that has problems.  But this is the one thing I want to focus

17  on, Your Honor, because we didn't have a chance to bring it to

18  the Court's attention until our reply brief because it hadn't

19  happened until after we had filed our Motion to Dismiss.  We've

20  asked the Court to take judicial notice of the fact that these

21  parties continue to perform under the contract that's at issue.

22  The Promotional Rights Agreements is still being performed by

23  both parties.

24        Mr. Hunt, on March 4th, fought Alistair Overeem.  He

25  references it in his opposition.  He was paid $750,000 for that

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  fight, Your Honor.  More money than he made in the summer of

2  2016 at UFC 200 when he fought Mr. Lesnar.  He hasn't lost a

3  single opportunity.  He's continuing to get fight opportunities.

4  He's making more money.  There is no RICO injury here at all.

5            And I would submit, Your Honor, that same analysis

6  applies to all of the other claims.  Because for all of them,

7  you've got to show a loss:  monetary loss or damage to property

8  that you've allegedly been deprived of.  He can't show any of

9  it.

10            So, unless the Court has specific questions, I think

11  that handles everything that's at issue.  And I'll just save the

12  rest of my time for rebuttal.

13            THE COURT:  Thank you.

14            And who -- oh, sorry.  Go ahead, Mr. Jacobs.

15            MR. JACOBS:  Good afternoon, Your Honor.  And I will

16  likewise reserve probably about half my time for rebuttal.  I

17  have no intention of repeating anything that was stated.  I

18  thought what I would do is address the issues that are more

19  specific or peculiar to Brock Lesnar's claim.

20            And the place to start, while it was touched upon just

21  a moment ago, is the issue of proximate causation as it relates

22  to particularity.  And specifically, with respect to Mr. Lesnar,

23  he cannot be required to defend against allegations about others

24  that have nothing to do with him.  That's the whole point of

25  particularity.  And, without going through everything that's in

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1  the papers -- and I do appreciate that you have read everything

2  and I know it was voluminous -- but there's one really good

3  example that I think highlights the problem here.  As was said,

4  there has to be proximate causation; the damages have to be

5  proximately related to the alleged violations.

6          And so, if you look at the allegations in the various

7  causes of action, Mr. Hunt alleges, for example, that he was

8  damaged by having to fight against multiple doping fighters and

9  then he lists them:  Frank Mir, Antonio Silva.  These obviously

10 are not Brock Lesnar.  They have nothing to do with him.  And

11 any damages caused by any alleged conduct that required him to

12 fight against those people cannot have anything to do with Brock

13 Lesnar.  And so he can't be required to respond to the Complaint

14 in the way that it's drafted because there's no way to know what

15 damages or what categories of damages are specific to the

16 allegations as against him as compared to allegations that have

17 nothing to do with him.

18          THE COURT:  Now, are you talking specifically about the

19 RICO claim or are you talking generally the entire -- all

20 claims?

21          MR. JACOBS:  I think all claims.  I think this is a

22 problem that permeates all of the claims with the possible

23 exception of the unjust enrichment claim which seems to be more

24 specific.

25          As to the reliance issue -- and this does also

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1  permeate, I think, all of the causes of action.  Certainly RICO,

2  fraud, false pretenses -- all of those claims require an

3  allegation of reliance on the false representations.  And so the

4  plaintiff in his Complaint and then as supplemented by his

5  opposition says that he relied on either Brock Lesnar's alleged

6  misrepresentation that he wasn't doping or he relied on the

7  material omission of the fact that he was doping.  So those are

8  the allegations.  And there have to be damages pled which he has

9  to show that he relied on these misrepresentations or omissions.

10          And this is why the request for judicial notice here is

11  so significant.  Because in ruling on a motion to dismiss, the

12  court is not required to and should not accept as true

13  allegations which are proven false.  And what he wants to do

14  here is have it both ways.  He wants to use the interviews that

15  Mr. Lesnar gave as part of his RICO claims and the predicate

16  acts, but then he wants you to somehow find that his own

17  statements, the very same types of interviews, where he said:  I

18  know that Brock Lesnar was doping and I don't care.  I'll beat

19  him anyway.  He wants you to ignore those and you can't because

20  they show that the allegations here are false.

21          And it's understandable why he would want you to ignore

22  those because they not only defeat any reliance arguments but

23  it's an incurrable problem.  He cannot overcome his own

24  statements which is the reason why we submitted that the

25  Complaint -- or that the Motion to Dismiss should be granted

1    without leave because his own statements not only defeat the

2    claim that he's filed but they defeat any attempt that he could

3    possibly make to plead a good claim in this case.

4           The last thing that I would talk about would be the

5    racketeering, the pattern of racketeering.  And I just want to

6    address, again, you don't have to accept allegations in the

7    Complaint that are factually impossible.  And the pattern of

8    racketeering, it's been alleged that it's both an open-ended

9    pattern and a closed-ended pattern.  And I just wanted to

10   address some of the statements that are made on both of them.

11          On the closed-ended continuity, the claim seems to be

12   that -- at least in part because you have to go further back in

13   time -- that the prior retirements of Brock Lesnar somehow

14   factor into this closed-ended continuity.  There's a couple

15   problems with that.  One, it has not been pled in the Complaint.

16   Two, any allegation that Brock Lesnar's prior retirements that

17   predated 2015 is somehow being a pattern of activity because

18   they were used to avoid drug testing under the UFC Anti-Doping

19   Policy, they have one significant problem and that is there was

20   no UFC Anti-Doping Policy before 2015 and there's also no

21   allegation that Mark Hunt ever was in line to fight Brock Lesnar

22   prior to 2015.  So it's -- those allegations to establish

23   closed-ended continuity simply are factually impossible in this

24   case.

25          As to open-ended continuity, it seems to be that

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1  looking forward, well, Brock Lesnar could unretire and again

2  avoid testing at any time.  Again, if you look at the UFC

3  Anti-Doping Policy, specifically at Article 5.7 which we asked

4  that judicial notice be taken of, it specifically says that if

5  he unretires he -- basically he has to serve his suspension from

6  that point going forward.  So, if he has 11 months left on his

7  suspension, he has to be in the pool for 11 months if he

8  unretires for testing.  So this notion and these arguments that

9  he could somehow step out of retirement and straight into the

10 ring is also factually impossible.

11          I think I probably haven't reserved that much time.  So

12 I'll end it there so at least I can respond.

13          THE COURT:  All right.  Thank you.

14          MR. JACOBS:  Thank you.

15          THE COURT:  You've got 3 minutes left.

16          MR. JACOBS:  Okay.  Thank you.

17          THE COURT:  Mr. Ingold.

18          MR. INGOLD:  Thank you, Your Honor.

19          Now, for clarification, was the Court inclined to allow

20 me any time to respond?  Or would the Court prefer I use all 15

21 minutes of my time?

22          THE COURT:  All 15 minutes of your time.

23          MR. INGOLD:  Thank you, Your Honor.

24          THE COURT:  It's their motion, so their burden.

25          MR. INGOLD:  I appreciate that, Your Honor.

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1          Your Honor, I think we start with the principle that

2   the Court has to construe all the allegations of the Complaint

3   as true and construe them in inferences in the light most

4   favorable to Mr. Hunt.  And what I see again and again in the

5   opposition is the defendants -- the oppositions -- the

6   defendants encouraging the Court to construe facts a different

7   way, construe facts in light of the defendants' preferred manner

8   of seeing things.

9          When we look at the *Iqbal/Twombly* standard, we only

10  have to show that the facts as alleged demonstrate whether it's

11  plausible that the defendants have committed RICO violations;

12  whether they've committed state conspiracy violations.  And I

13  think that seems to be glossed over.  They want the Court to

14  take in all this other evidence, everything else, and construe

15  all these facts in the light most favorable to them.  And I

16  think that's not appropriate on this motion.

17          THE COURT:  Well, that part I will agree with you.  I

18  intended to apply *Iqbal/Twombly* --

19          MR. INGOLD:  Okay.

20          THE COURT:  -- and the plausibility standards from

21  those.  So I'm on the same page with you so far.

22          MR. INGOLD:  I will move on in that case, Your Honor.

23          Looking at this case big picture, you know, it's been

24  described, well, we can't substitute normal commercial

25  transactions for a RICO case.  But what the Complaint has

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  alleged is not just a series of normal commercial transactions.

2  We've alleged an ongoing course and conduct by the enterprise

3  and the parties that make up the enterprise, including

4  Mr. Lesnar; including Mr. White; including Zuffa, LLC, whereby

5  they have knowingly pitted cheating fighters against clean

6  fighters.  In Mr. Hunt's case, that's happened on at least three

7  occasions.  Now, the RICO claim goes directly -- most directly

8  towards the UFC 200 fight with Lesnar and we've covered that and

9  we've explained why mail fraud is the predicate underlying act;

10  why we have alleged mail fraud adequately.

11       The defendants -- I heard argument about reliance.

12  Well, under the *Bridge v. Phoenix* case, Your Honor, the Court

13  made clear that under the mail fraud in that case, or in our

14  case wire fraud, reliance doesn't have to be alleged.

15  Similarly, the falsity of the allegation that was communicated

16  by means of wire fraud or mail fraud, that communication itself

17  doesn't have to be false.  But, again, the defendants seem to be

18  putting up these edifices for Mr. Hunt to jump over that the

19  Ninth Circuit has said just aren't there.  The quote from *Bridge*

20  says, "The gravamen of the offense [of mail fraud] is the scheme

21  to defraud, and any "' mailing [that is] incident to a essential

22  part of the scheme' ... satisfies the mailing element, ..., even

23  if the mailing [itself] 'contain[s] no false information."

24       So I think we get there on the mailing fraud.  The main

25  point of contention seems to be the two elements, the causation

—————— 2:17-cv-85-JAD-CWH - May 22, 2017 ——————

1    and the --

2            THE COURT:  Standing and proximate cause.

3            MR. INGOLD:  I'm sorry?

4            THE COURT:  Standing --

5            MR. INGOLD:  Yes.

6            THE COURT:  -- and proximate causation.

7            MR. INGOLD:  Yes.  And the damages and proximate cause

8    were referred to as the two elements for standing.

9            I think when the Court looks at the case law we've

10   cited -- *Mendoza*, *Marceau*, the *Bulletin Displays* case, *Bridge v.*

11   *Phoenix Indemnity* -- what we see, and *Mendoza* says specifically,

12   what the plaintiff is entitled to -- in this case what Mark Hunt

13   is entitled to -- is an opportunity to pursue gainful

14   employment, contractual relations, these other opportunities

15   free from the defendants' illegal, fraudulent schemes.  And that

16   alone is what can meet the requirement for harm under the RICO

17   statutes.  And that's exactly what Mr. Hunt has alleged.  He's

18   alleged lost promotional opportunities.  I believe it's at

19   paragraph 124 of the Complaint.

20           Now, the defendants are saying, well, you know, you

21   seem to have just raised this for the first time in your

22   opposition talking about the Juggernaut brand, talking about the

23   Mark Hunt brand that he sells and markets.  But I would submit,

24   Your Honor, that we're allowed to allege damages generally.  We

25   don't have to prove exactly how many -- you know, what the

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1  dollar figure is at the pleading stage.  In fact --

2       THE COURT:  I would agree.  You don't have to prove the

3  dollar figures at this point.

4       MR. INGOLD:  And so, you know, if we look at -- *Diaz v.*

5  *Gates* is a case cited by -- I take the Court at her word that

6  you've read all the --

7       THE COURT:  I read *Diaz*.

8       MR. INGOLD:  Yeah.

9       And what you'll notice is that the court says, "There

10 may be a practical difference between current and future

11 employment for purposes of RICO—for instance, it may be easier

12 to prove causation or determine damages for a plaintiff who has

13 lost current employment—but this difference is not relevant to

14 whether there was an injury to 'business or property.'"  The

15 court in *Diaz* specifically said you can look forward to forward

16 damage, future injury.

17      Now, I think we have alleged past and future damages.

18 Mark Hunt stepped in the ring with a cheating Brock Lesnar,

19 placed there by the fraudulent agreement by the enterprise.  And

20 they defrauded Mr. Hunt when they did that.  They defrauded the

21 Pay-Per-View subscribers.  They defrauded many people who were

22 paying or relying on the fact that Mark Hunt was going to fight

23 a fair fighter.  And that's simply not what happened.  Um --

24      THE COURT:  How is it -- how can you -- I guess the

25 question may be ultimately is what facts have you alleged

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1 currently to demonstrate and how -- as opposed to just

2 conclusory allegations that these damages, these lost

3 opportunities, are from the RICO activity and the racketeering

4 activity and not merely from the fact that he got beat?

5         MR. INGOLD:  Well, Your Honor, the defendants seem to

6 say, well, we would have to prove that but for the cheating by

7 Mr. Lesnar, Mark Hunt would have won the fight.

8         THE COURT:  But for the racketeering activity.

9         MR. INGOLD:  Well, if -- if the defendants had not, in

10 our view, committed wire fraud; if they had said, we're going to

11 make Mr. Lesnar go through the same testing protocols; we're

12 going to hold him to the same standards as every other fighter,

13 as Mr. Hunt in fact, then it would have likely turned up that

14 Mr. Lesnar was cheating; he would have not been able to compete;

15 they would have substituted another fighter.  Even if Mr. Hunt

16 would have fared better against a clean Lesnar, that would have

17 helped his brand.

18         THE COURT:  How is all of what you've just described

19 not patently speculative?

20         MR. INGOLD:  Well, Your Honor, *Mendoza* says that we're

21 allowed to allege damages generally at the pleading stage.

22         THE COURT:  True.  *Mendoza* was also pre-*Iqbal/Twombly*.

23         MR. INGOLD:  Well, and that's -- I understand that,

24 Your Honor, but we're talking about plausibility under

25 *Iqbal/Twombly*.

─────── 2:17-cv-85-JAD-CWH - May 22, 2017 ───────

1      THE COURT:  We are as opposed to notice pleading.  And

2   *Mendoza* is basically talking about notice pleading and what that

3   requires.  And essentially post-*Iqbal Twombly* -- what?  2010? --

4   it increases that burden to the point where ya have to have a

5   theory that's plausible --

6      MR. INGOLD:  Right.

7      THE COURT:  -- not merely speculative.

8      MR. INGOLD:  Your Honor, I would submit that if Michael

9   Jordan never won a basketball game kids wouldn't be buying Air

10  Jordan sneakers from Nike for hundreds of dollars; that if Mike

11  Tyson never won a boxing fight, people wouldn't have paid

12  hundreds of dollars in Pay-Per-View fees to see him fight.

13      The fact of the matter -- and we put this in our

14  brief -- is that losing fights is bad for business.

15      THE COURT:  But --

16      MR. INGOLD:  And what the defendants did is they

17  orchestrated a scheme to maximize their own sale value, the

18  UFC/Zuffa sale value, at personal gain to Mr. White by virtue of

19  conspiring with Mr. Lesnar to pay him, in his own words, a

20  boatload of money and hiding that from Mr. Hunt.

21      THE COURT:  How did they increase the value to

22  themselves by this scheme you're alleging?

23      MR. INGOLD:  Now --

24      THE COURT:  Why does having a doping versus nondoping

25  fighter -- why would that increase -- you know, maybe educate me

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1  on this a little bit because I'm just not seeing how that would

2  be a particular value.

3       MR. INGOLD:  Your Honor, I would submit that having

4  doping fighters it makes then bigger, faster, stronger, more

5  entertaining to watch.  That in general.  Now, we can talk

6  specifically about Mr. Lesnar who is in the WWE.

7       Mr. Lesnar's one of the biggest names in mixed martial

8  arts.  He was before he retired; he continued to be a very large

9  name and to this day continues to be a very large name in the

10 WWE.  And UFC knew that they needed to get a big draw; they

11 needed to show lots of Pay-Per-View sales.

12      Now, again, I would love to get into this in more

13 discovery to figure out what happened here --

14      THE COURT:  Well, assume --

15      MR. INGOLD:  -- and --

16      THE COURT:  -- assume I'm with you at this --

17      MR. INGOLD:  Okay.

18      THE COURT:  -- point.  Okay?  Assume I get the idea of

19 having this WWE draw.  But why would there be additional value

20 in putting someone who, as you've described, is not a fair fight

21 against that person?  Why would that -- perhaps I just don't

22 completely understand the entertainment industry well enough to

23 know why that would be a particular financial benefit to Zuffa.

24      MR. INGOLD:  Well, they are going to bring over --

25 first of all, Your Honor, I think that the product is more

──── 2:17-cv-85-JAD-CWH - May 22, 2017 ────

1  entertaining.  I think what when you have bigger, stronger,

2  faster fighters who can take a punch more reliably, deliver a

3  punch more reliably -- what customers watch UFC for is the

4  excitement.  They want to see the best fights they can.  They

5  want to see guys go toe to toe, head to head.  They want to see

6  big, strong fighters compete.  And that's what you get when you

7  have a enhanced fighter.  And that's what the Anti-Doping Policy

8  for UFC purports to try to dissuade.  Although the UDP, we

9  disagree with.  We ask the Court not to take judicial notice of

10 the UFC Anti-Doping Policy because we disagree with its

11 contents.  But, to go to the Court's question, from a product --

12 it's a more entertaining product; it's a more entertaining

13 fight.  People are drawn to that.  You will get more

14 Pay-Per-View sales.  You will get more promotional

15 opportunities.

16         With respect to Mr. Lesnar, he was a specific draw.  He

17 was a distinct draw because he had huge name recognition.  And I

18 think what discovery may bear out, what the jury may find

19 inference, by circumstantial evidence, is the fact that UFC and

20 Mr. Lesnar got together and Mr. Lesnar said:  Hey, I've got a

21 problem.  I've been using certain substances that are covered

22 under your Banned Substances Agreement.

23         And UFC said:  Hey.  No problem.  Here's what we'll do.

24 We'll hold off for a little bit.  We'll put you in inside of the

25 4-month testing window and we'll just give you a waived

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  authorization for it.  We'll lie to Mark Hunt.  Mark Hunt will

2  never know that he's fighting a cheating fighter.

3         So, I mean -- and, again, counsel's argued, well,

4  you've got to use Mr. -- take Mr. Hunt's comments against him in

5  that respect.  Mr. Hunt -- I think there's two differences.

6  First of all, all fighters engage in this prefight banter.

7  Everyone talks about how they are gonna beat everyone else up.

8  That's part of the excitement; that's part of the entertaining.

9  But the difference, Your Honor, is that Mr. Hunt wasn't engaged

10  in a conspiracy to defraud Mr. Lesnar.  Mr. Lesnar was, at the

11  time he made these statements that we attack him for in our

12  Complaint, engaged in a conspiracy to defraud Mr. Hunt.  So I

13  think that that is a substantial, significant difference.  And,

14  frankly, I mean, if they want to say that Mr. Hunt should have

15  known better, that's an issue for proof before the jury.

16         So I do also want to get to the -- does the Court have

17  any questions so far at this point?  Go ahead.

18         THE COURT:  I'd love to move to the fraud claims for a

19  minute.

20         MR. INGOLD:  Okay.

21         THE COURT:  I have a question on the way those are

22  framed.  So they are pled -- so Claims 3 and 4, they are

23  essentially pled as crimes; right?  Would you agree with me

24  those are the statutory basis for those crimes under Nevada law?

25         MR. INGOLD:  Uh . . .

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1           THE COURT:  False pretenses and fraud, NRS 205, those
2   are criminal --
3           MR. INGOLD:  Yes.
4           THE COURT:  -- statutes; right?
5           MR. INGOLD:  Yes.
6           THE COURT:  What I'm seeing here is that those were
7   basically what you've alleged as the premises, the racketeering
8   acts, under the Nevada RICO claim, which is Claim 2.  Would that
9   be a fair assessment of what those are?
10          MR. INGOLD:  Yeah.  The Nevada RICO --
11          THE COURT:  Those are the predicate acts?
12          MR. INGOLD:  Yeah.  And there were four predicate acts
13  under the Nevada RICO claim:  fraud, false pretenses, taking
14  property, and circumstances not amounting to robbery.  And I'd
15  have to look at my papers to --
16          THE COURT:  So --
17          MR. INGOLD:  -- add the fourth.
18          THE COURT:  Right.  But these are two of them, fraud
19  and false pretenses.
20          So my question is did you intend to plead the Third and
21  Fourth Causes of Action as their own independent claims for
22  relief under Nevada law?
23          MR. INGOLD:  Yes.
24          THE COURT:  All right.
25          So then why did you use the criminal as opposed to --

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  the criminal statute, Section 2 -- or Chapter 205, instead of

2  the common law elements?

3         MR. INGOLD:  That's a great question, Your Honor, and I

4  submit that's why you asked it.

5         But, uh -- we cited under the criminal law statutes,

6  but I think that the common law standards still apply.  And I

7  think we've adequately alleged under the common law elements.

8         THE COURT:  So false pretenses is a crime under Nevada

9  law under 205.380.  I think that the common law corollary to

10 that would be fraud in the inducement or fraudulent concealment.

11 Does that make sense to you?  Is that what you intended to plead

12 in Claim 4?

13        MR. INGOLD:  Well, I think the *Hale* -- I've looked --

14 *Hale v. Burkhardt* sets forth the civil false pretenses cause of

15 action.  And I think there is a stand-alone false pretenses

16 civil cause of action under the *Hale* case.

17        THE COURT:  I'm trying to understand though what that

18 legal theory is.  Just kind of -- just the theory of it.  I'm --

19 the way I read Claim 4 is that -- because you've got some

20 contract claims; right?  So you've got breach of contract;

21 you've got bad faith.  And so that theory is basically we had a

22 deal and you didn't enforce it fairly, essentially, or you

23 breached it.  Right?

24        MR. INGOLD:  Correct.

25        THE COURT:  So the bad faith would be and you -- it was

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1  contrary to the spirit that was intended by this contract.

2        MR. INGOLD:  Correct.

3        THE COURT:  And how I read Claim 4 is that's more of

4  the ya induced me into signing this deal based on false

5  representations that you would be uniformly enforcing this

6  policy.  Is that essentially what Claim 4 is?

7        MR. INGOLD:  I think Claim 4 is a little bit broader

8  than that.  I think Claim 4, generally speaking -- UFC -- line 1

9  of the Anti-Doping Policy is UFC has the strictest Anti-Doping

10  Policy in the world.  That is patently false.  We're gonna show

11  at trial that that is patently false.  But they put on this

12  facade and broadcast to the world these are gonna be fair

13  fighters; we're gonna crack down on doping.  But that's not what

14  hap- -- that's not at all what their actions reflect.

15        THE COURT:  Okay.  So what --

16        MR. INGOLD:  And I think --

17        THE COURT:  -- was the reliance essentially for this

18  claim?  I'm just trying to understand your general theories

19  here.

20        MR. INGOLD:  I understand.

21        THE COURT:  And, I mean, it seems to me that one of the

22  flavors that comes out of this Complaint is you induced me based

23  on your representations about this Anti-Doping Policy and the

24  way it would be enforced.  You induced me to enter into this

25  agreement and you induced me to fight these fighters who, turns

--- 2:17-cv-85-JAD-CWH - May 22, 2017 ---

1  out, were dirty.

2          MR. INGOLD:  Correct.

3          THE COURT:  Is that what you're trying to say in

4  Claim 4?

5          MR. INGOLD:  In part.  In part.

6          Going specifically to reliance, Mark Hunt didn't use

7  steroids.  Now, if he would have known that there is a huge

8  payday waiting for him and he gets a little slap on the wrist,

9  maybe he would have.  I'm not saying he would have.  But Mark

10 Hunt adhered to the terms of the Anti-Doping Policy.  He has not

11 tested positive for any UFC tests.  Numerous fighters that he's

12 fought have.  So -- so -- and then he's taken fights believing

13 that the UFC is going to hold all these fighters to the same

14 standard.

15         Now, the defendants have said --

16         THE COURT:  Right.  So he's entering into those

17 contracts --

18         MR. INGOLD:  Yes.

19         THE COURT:  -- in reliance on it.  So in effect -- I

20 mean, do you really kind of have two theories here?  One,

21 enforce the contract and they breached it and so we get damages

22 from that breach and from the bad faith or, secondly -- I mean,

23 do you have a fraud-in-the-inducement type claim here?  Are you

24 intending to essentially claim, hey, you can't enforce this

25 contract against us, you can't continue to hold us to it,

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  because it was induced by fraud?

2          MR. INGOLD:  Well, we're not saying that -- that the

3  contract is unenforceable.  Mark Hunt, as defendants have

4  pointed out, continued to fight under this contract because as

5  far as we're concerned he is still under contract; there hasn't

6  been any determination that the contract is invalid.  I think --

7          THE COURT:  And you're not contending that the

8  contract's invalid.

9          MR. INGOLD:  At this point in time, we haven't alleged

10  that in our Complaint.

11          THE COURT:  Okay.

12          MR. INGOLD:  It's -- but it's a bigger picture.  Now,

13  whether the contract is deemed invalid as part of the relief

14  under the false pretenses, we haven't specifically sought that.

15  But the bigger picture here is --

16          THE COURT:  Wait.  Hold on.  Go back to what you just

17  said.  "Whether the contract is deemed invalid as part of the

18  relief under the false pretenses, we haven't specifically sought

19  that."  But do you intend to?  I mean, we're here early; right?

20          MR. INGOLD:  I --

21          THE COURT:  This is --

22          MR. INGOLD:  -- understand, Your Honor.

23          THE COURT:  -- an early stage.  And sometimes you plead

24  things into -- you know, there are square pegs and round holes

25  and they don't quite fit right and that's what we're trying to

1  do right now in this process.  That's really what 12(b)(6) is.

2  Let's make sure that we have the pegs and the holes matching up.

3  And I want to make sure you have that opportunity to the extent

4  that I think you can plead a plausible claim.

5         So I'm trying to understand, though, this false

6  pretenses theory.  Because if you're not going to at any point

7  and you're not currently challenging the validity of the

8  contract, well, that impacts other claims like the unjust

9  enrichment claim, for example.  Under Nevada law, if you have

10  the same damages that would be covered by a contract, you can't

11  have a separate unjust enrichment claim against the contracting

12  party for that.

13         So I'm just gonna tell you that I generally, as I was

14  reading your false pretenses claim -- and this is your

15  opportunity to tell me if I'm just flat-out wrong and that it

16  wasn't intended that way -- when I was reading it, I was reading

17  that as a fraud-in-the-inducement/fraudulent- concealment claim.

18         MR. INGOLD:  We're not seeking to set aside the

19  contract --

20         THE COURT:  Okay.

21         MR. INGOLD:  -- to answer the Court's question

22  directly.  I read false pretenses as something more broad than

23  just a contract defense.  I read false pretenses as

24  something stand-alone under the *Hale v. Burkhardt* case.

25         And I will say as far as the unjust enrichment that the

──────── 2:17-cv-85-JAD-CWH - May 22, 2017 ────────

1   Court has addressed just briefly in the past comment, that the

2   *Wal-Mart Wage & Hour* case, the same argument was raised by the

3   defendants in that case.  And they said, well, there's a

4   statute -- a wage-and-hour statute that supplies the same relief

5   as they are seeking under this unjust enrichment case.  And

6   Judge Pro denied the Motion to Dismiss saying, no, there might

7   be other avenues for the plaintiffs to recover under unjust

8   enrichment in the *Wal-Mart Wage & Hour* cases that we've cited.

9   And I think that's an important analogy to the case here.  We're

10  talking about more than just the contract that Mark Hunt had

11  with UFC.  There are other issues involved; there's other relief

12  that Mark Hunt is able to seek under an unjust enrichment

13  theory.

14          THE COURT:  Okay.  If we can move to contract for a

15  second because --

16          MR. INGOLD:  Sure.

17          THE COURT:  -- your time's about up.

18          What is the provision in the contract that you allege

19  was breached?

20          MR. INGOLD:  UFC's contract states that it will conduct

21  all bouts in accordance with the Nevada Athletic Commission -- I

22  can find it briefly, Your Honor.

23      (Pause in the proceedings.)

24          MR. INGOLD:  Paragraph 3.1 of the Promotional and

25  Ancillary Rights Agreement says:

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1          "Each Bout shall be . . . conducted pursuant to the
2    rules and regulations of the athletic commission, federation or
3    official authority having jurisdiction over the Bout . . . .
4    Fighter" -- which is Mr. Hunt -- "and ZUFFA shall comply with
5    and be bound by the rules and regulations of the Athletic
6    Commission."
7          And we attached the Complaint.  Mr. Williams and I have
8    disagreed in our papers about the extent to which that needs to
9    be specifically alleged.  In fact, the cases he cite -- he
10   criticizes Mr. Hunt and our side in putting forth Nevada State
11   law case law that says you do not need to plead with that level
12   of the specificity and then cites to a case that applies the
13   state law pleading standards from Illinois, Pennsylvania, and
14   Missouri, I believe.
15         THE COURT:  All right.  So I need to, though, be able
16   to find from the facts -- I need to -- I mean, even under notice
17   pleading, from the facts we need to be able to understand what
18   breach you're alleging and just saying that they breached these
19   contracts isn't quite enough.
20         Do you have it as a paragraph in the facts?
21         MR. INGOLD:  This paragraph is not specified in our
22   Complaint.  And I think --
23         THE COURT:  Okay.
24         MR. INGOLD:  -- that that's -- we can amend and take
25   care of that if that's a concern to the Court.  Um . . .

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1           THE COURT:  And is that in both contracts?  Or is that
2    the --
3           MR. INGOLD:  The --
4           THE COURT:  -- is that the PARA or the Bout Agreement?
5           MR. INGOLD:  The Bout Agreement incorporates by
6    reference the Promotional and Ancillary Rights Agreement.
7    Therefore, by extension, we're alleging that both agreements
8    were breached.
9           THE COURT:  Okay.
10          All right.  I'll give ya two more minutes.  Go ahead.
11          MR. INGOLD:  Thank you, Your Honor.
12          I think we've set forth the cognizable injury.  I think
13   we've set forth a breach of -- strike that.  Not a breach --
14   damages to Mr. Hunt's brand, his right to future opportunities.
15   There -- *Knevelbaard Dairies*, *Mendoza*, *Diaz* -- all these cases
16   show that Mr. Hunt has a right to seek future opportunities free
17   from intervention, machinations of the defendants' illegal
18   fraudulent schemes.  And that's exactly what they did is they
19   set up a cheating fighter, made it -- they stacked the deck
20   against Mr. Hunt.  And that's exactly what RICO is designed to
21   compensate for.  This is not a simple commercial dispute, Your
22   Honor.  This is deals made behind closed doors that defrauded
23   not just Mr. Hunt but many other people.
24          And we talked about proximate causation.  The *Mendoza*
25   case says look at the most direct victim.  Who was the most

1  direct victim of UFC's and Mr. Lesnar's agreement to put a

2  cheating Mr. Lesnar in the ring with Mr. Hunt?  The most direct

3  victim was Mr. Hunt and, therefore, Mr. Hunt was -- his damages

4  were proximately caused by the UFC.

5        *Knevelbaard Dairies* says that if we talk about, well,

6  what damages can you show, they talk about, well, how can you

7  show that milk prices were influenced by the defendant's

8  activities.  In *Knevelbaard Dairies*, the Ninth Circuit says

9  let's let the experts get to that; this is not appropriate for

10  determination at the pleading stage.

11        Anything else, Your Honor?

12        THE COURT:  No.  Thank you --

13        MR. INGOLD:  Thank you.

14        THE COURT:  -- very much.

15        Mr. Williams, rebuttal.

16        MR. WILLIAMS:  Thank you, Your Honor.

17        Your Honor, I want to answer one of the Court's

18  questions that I don't think is even germane, actually, to

19  resolving this but I think it's important to give you some

20  context.

21        With respect to the Court's question about why would

22  Zuffa do this?  What's the benefit to putting on a fight with a

23  known doping fighter?  How could that be good for business?  The

24  answer is it's not.  Let us tell you -- how did we get here for

25  UFC 200?  They don't tell you this in the Complaint because they

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1  want to avoid this.  Jon Jones was supposed to be the headliner

2  of that fight.  He was yanked.  The reason Hunt and Lesnar

3  became a co-main event is because Jon Jones tested positive for

4  prohibited substances and we pulled him off the card.  Period.

5  That's why we're here now.  I just today tell it to the Court

6  for its information because it doesn't make any sense to want to

7  put on doping fighters; it's not good for business.

8          Your Honor, let me see if I can quickly tick off some

9  of the other points that were raised.  I agree.  It's certainly

10  an *Iqbal* and *Twombly* standard that applies here.  But all of the

11  cases that we've cited, whether it's *Canyon County* or *Hemi*

12  *Group*, they all recognize that the standing issue can be

13  resolved on a 12(b)(6) motion.  So I don't think I need to spend

14  a lot of time on that.

15          Reliance.  The Court had the same question that I had.

16  I agree under *Bridge* you don't have to allege reliance for

17  purposes of establishing a RICO claim premised on mail or wire

18  fraud.  No debate there.  But, as you've pointed out, they've

19  asserted these weird criminal case -- statutes as quasi-fraud

20  claims and those absolutely require you to show reliance.  And

21  so -- and that hasn't been demonstrated.  They haven't

22  identified the misrepresentation or when it was said or who said

23  it or that they relied on it.  That's not there.  So, when it

24  relates to those causes of action, they haven't shown reliance.

25          They invoke the *Mendoza* case, *Marceau*, *Bridge*, *Bulletin*

—————— 2:17-cv-85-JAD-CWH - May 22, 2017 ——————

1  *Displays*.  But, Your Honor, I think we adequately pointed this

2  out in the reply.  There's a fundamental distinction between the

3  lost opportunities or the property that was being alleged to

4  have been damaged in those cases.  *Mendoza* is a lost-wages case.

5  They talk about the fact their property claim was to lost wages.

6  Mr. Hunt hasn't lost any wages.  He references it in his

7  opposition, but it's nowhere in the Complaint.  And the facts,

8  the judicially noticeable facts, establish that he hasn't lost a

9  single cent.

10           *Bridge* and *Bulletin Displays* are sort of these lost

11  bidding opportunity cases.  But, again, they are specifically

12  identifiable.  They're in the past; they're for a known amount.

13  *Bridge*, the Supreme Court case, was dealing with these tax liens

14  that people would bid on.  And it was -- if you read the *Hemi*

15  opinion, subsequently when the plaintiff in that case is trying

16  to argue that *Bridge* allowed them to pursue a RICO case and the

17  court rejects that, they say, *Bridge* dealt with a zero-sum gain,

18  quote-unquote; if one bidder lost, the other bidder got it.

19  Okay.  That's not what we have here.

20           THE COURT:  Right.

21           MR. WILLIAMS:  Okay?

22           So next, damage to the brand.  The first time we see

23  "damage to the brand" is in the opposition.  And I don't even

24  think the Court should consider it.  But let's think about it

25  for a second.  It appears to me what they are saying -- because

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1   this is under this concept of notice pleading and we don't have

2   to prove damages or we can allege generally.  I get all of the

3   pleading standards, Your Honor.  But where is Juggernaut?  What

4   is Juggernaut?  Is Mark Hunt Juggernaut?  Is that a separate

5   entity?  I can guarantee you if Juggernaut is a separate entity

6   that runs this brand, you better be pleading it in the Complaint

7   because I don't see how Mark Hunt can do that as a plaintiff

8   under just general concepts of, you know, corporation law.

9        I listened to counsel for 15 or 20 minutes under the

10  Court's questioning.  I never heard once any identification of

11  financial loss.  None.  No damages.  Zero.  I still haven't

12  heard it.  Your Honor, that wipes out every single claim he's

13  got, RICO or not.

14       Proximate cause.  I want to focus on this for just a

15  little bit because I think it's so important, Your Honor.  And

16  you hit the nail on the head.  How is this not speculative in

17  the extreme?  I mean, let's just go through what a trial would

18  like if we got this far.

19       So, if Mr. Lesnar had not taken a prohibited substance,

20  would Mark Hunt have beat him?  We have no idea.

21       Did Mark Hunt lose to Brock Lesnar because of the

22  prohibited substance or was it because he didn't train well, he

23  didn't feel well, nerves?  Any other reasons why these fighters

24  lose fights.  Who knows.  We're not gonna be able to know that

25  no matter what gets pled, Your Honor.  This is always going to

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1   be just as speculative.

2          Had Hunt won, would he have received these promotional

3   opportunities that we're talking about that were lost?  We don't

4   know.

5          If he had got -- what would they have paid him?  Again,

6   we don't know.

7          If we were -- if we're at trial in the context that

8   were in now where it was a loss originally, turned into a

9   no-contest, well, are the lost opportunities that never came

10  attributable to the no-contest or are they attributable to the

11  fact that Mr. Hunt has lost 11 other times in the UFC, including

12  as recently as March 4th?  Or could it be attributable to the

13  fact that you know what?  My T-shirts aren't selling because

14  there's not a lot of interest in the Heavyweight Division right

15  now?  Or maybe the T-shirts are a bad design or of poor quality.

16  Again, Your Honor, the speculation is endless with respect to

17  proximate cause and how you're going to apportion the damages to

18  the alleged wrongful conduct.  It doesn't end.

19         And, when you look at *Canyon County* and the *Anza* case

20  and *Hemi Group*, all of which focus on proximate cause, any one

21  of these intervening factors separates Zuffa's and White's

22  alleged injurious conduct versus the injury that Hunt is now

23  complaining about.

24         Unless the Court has any other questions, I'm ready to

25  sit down.

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1           THE COURT:  Your time's up any way.

2           MR. WILLIAMS:  All right.  Perfect.  Thanks, Your

3   Honor.

4           THE COURT:  Mr. Jacobs.

5           MR. JACOBS:  Thank you, Your Honor.  And I was sitting

6   there and I was hesitating on whether I should say anything for

7   fear of detracting from what was just said.  But let me just --

8           THE COURT:  The lawyer's forever dilemma; right?

9           MR. JACOBS:  Right.

10          So there was one -- only one thing, though, that I did

11  want to comment on and that is this notion that plaintiff's

12  counsel has made that Mark Hunt's statements in the interview,

13  which are the subject of the request for judicial notice, are

14  somehow prefight banter.  I would invite the Court to go back

15  and look specifically at those.  This is not Mark Hunt saying I

16  will beat Brock Lesnar every time I fight him.  This is Mark

17  Hunt saying, I know that Brock Lesnar is doping and I don't

18  care.  And, when you put that up against the Complaint, not only

19  as it is pled but under any possibility of how it could be pled,

20  you see why it -- it just simply defeats this Complaint.  It

21  defeats all of the theories.  It certainly defeats the Complaint

22  as it's pled right now.  And, if you ask yourself how can they

23  plead around it, the answer is they cannot.

24          And, with that, I will leave a minute or so remaining.

25  Thank you, Your Honor.

————— 2:17-cv-85-JAD-CWH - May 22, 2017 —————

1          THE COURT:  Thank you.

2          Okay.  Thank you all for your arguments and your

3    answers and, again, for the very well-done briefing in this

4    case.

5          So my intention at this point is to rule on the record

6    and state my findings and conclusions on the record.  I am not

7    going to be issuing a separate order.  There will be a minute

8    order that will reflect my findings and conclusions and my

9    ruling and, of course, the transcript as well.  So I -- as much

10   as I would love to put together a well-prepared order on this, I

11   also know that there's some value in knowing where you stand

12   when you leave the courtroom and so that is my goal at this

13   point.

14         So, for the record, again, we are here on two Motions

15   to Dismiss, one filed by Zuffa and Mr. White; the other filed by

16   Mr. Lesnar.  They are 11 and 30 in the record.

17         As we've been talking about, these are motions under

18   12(b)(6).

19         Of course, I apply the plausibility standards under

20   *Iqbal* and *Twombly*, *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v.*

21   *Twombly*.  And under those standards:

22         "To survive a motion to dismiss, a complaint must

23   contain sufficient factual matter, accepted as true, to 'state a

24   claim to relief that is plausible on its face.'"

25         "A claim has facial plausibility when the plaintiff

———— 2:17-cv-85-JAD-CWH - May 22, 2017 ————

1  pleads factual content that allows the court to draw the

2  reasonable inference that the defendant is liable for the

3  misconduct alleged."

4          In considering a motion to dismiss for failure to state

5  a claim like these motions, I accept all of the well-pled

6  factual allegations in the Complaint as true and I construe them

7  in the light most favorable to the plaintiff.

8          While a plaintiff is not required to plead detailed

9  factual allegations, a plaintiff must offer more than "labels

10 and conclusions" or a "formulaic recitation of the elements of a

11 cause of action."  "Factual allegations must be enough to raise

12 a right to relief above the speculative level."

13         So those are the -- that's the framework under which

14 I'm analyzing these two motions.

15         Now, this is a relatively low threshold at this point.

16 Importantly, the question is not whether the plaintiff can prove

17 his claims with evidence today.  I don't evaluate the merits of

18 these claims today at this stage.  The question is whether the

19 facts pled, the facts that I must take as true at this point,

20 give rise to reasonable inferences that the plaintiff has stated

21 plausible claims.

22         I want to talk first about the requests for judicial

23 notice.  There were a number of those from everyone.

24         To answer the question of whether the plaintiff has

25 pled plausible claims under *Iqbal* and *Twombly*, the materials

1   that I look at are limited.  Although the parties have offered

2   me a number of items outside the four corners of the Compliant,

3   like affidavits, newspaper articles, emails, YouTube videos, UFC

4   policy and press releases, and fight records, suggesting that I

5   can take judicial notice of them, I decline that request.  I am

6   not going to turn this into a motion for summary judgment at

7   this time.  I am keeping this within the four corners under

8   12(b)(6).

9           These materials, first of all, are not properly the

10  subject of judicial notice.  Their meaning is disputed.  There

11  is not universal agreement on them.  It's just these are not

12  items that I can take judicial notice of generally.  They also

13  haven't -- for the most part, they have not been incorporated by

14  reference in the Complaint in a way that I find justifies my

15  consideration of these materials at this point.  So I decline

16  the invitation to consider them at this time.

17          I do, however, consider -- and I have considered -- the

18  publicly filed records because I can take judicial notice of

19  those.  But I'm gonna just be candid with you.  They all -- they

20  did not play heavily -- they don't play heavily into my ruling.

21  And I also consider one of the contracts, the Promotional and

22  Ancillary Rights Agreement because it was incorporated into the

23  Complaint and a signed copy was attached as Exhibit A to the

24  Complaint.  I don't consider the Bout Agreement because the copy

25  that was attached is not signed.

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1          So, turning now to the allegations in the Complaint

2     that are, I think, fleshed out a bit by those additional items

3     that I considered or took judicial notice of or found

4     incorporated into the Complaint.

5          I'm starting with Count 1, the racketeering claim, the

6     Federal RICO claim.  I dismiss this claim with leave to amend

7     and with some cautionary advice.  I find that there are a number

8     of deficiencies with this claim as it's pled.  I'm going to

9     borrow Mr. Williams's term and say that this claim appears to

10    me, as does the Nevada RICO claim, to be an overenthusiastic use

11    of RICO in this case.

12         The primary problem, and alone a reason to dismiss this

13    case, is the lack of demonstrated RICO standing.  A RICO

14    plaintiff must plead a tangible and concrete financial loss to

15    business or property.  Personal injuries don't qualify as

16    injuries recoverable under RICO.  Even when you try to explain

17    that it's some specialized business personal injury, it doesn't

18    change the nature of these damages.  These are personal

19    injuries.  Those don't qualify.  They are not recoverable under

20    racketeering laws.  And the losses alleged to reputation and

21    business are purely expectancy damages here or they are too

22    speculative.  Neither of those are recoverable then.  So I find

23    the *Ove v. Gwinn* case, which is 264 F.3d 817, it's a 9th Cir.

24    2001 case, to be persuasive in evaluating the pleadings on the

25    RICO-standing issue.  And you just haven't pled it here.

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1          I also don't find that the facts as pled permit me to
2    infer proximate cause here.  This is compounded by the absence
3    of facts from which I can reasonably infer that the RICO
4    conduct -- this concealing of exemptions to cause clean fighters
5    to fight doping fighters -- caused the plaintiff's injury.  This
6    theory is attenuated.  And there are so many factors, possibly
7    intervening factors here.  I think the *Canyon County* case is
8    instructive.  And here when I apply this law there are no facts
9    at this point from which I can infer that these alleged damages
10   flowed from racketeering conduct.  More is needed.  And I'm just
11   gonna say, quite candidly, that I don't know that you can get
12   there at this point.  I think this maybe an overenthusiastic use
13   of RICO.
14          There's a separate and additional problem with the
15   claim and that is that the plaintiff has not pled any
16   racketeering conduct by White.  There's a reference to an
17   interview with ESPN on June 3rd, 2016, where White denied
18   Lesnar's return to the UFC, but there's no allegation tying
19   White to the enterprise of granting exemptions and failing to
20   enforce the Anti-Doping Policy at UFC.  So these are separate
21   reasons that I'm dismissing Count 1 against -- or this is a
22   separate reason that I'm dismissing Count 1 as against White.
23          The final deficiency -- or one final deficiency with
24   this claim is that the plaintiff has not pled facts to show that
25   Lesnar or White had involvement in the operation of the RICO

1  enterprise itself as required by the Supreme Court's decision in

2  *Reeves v. Ernst & Young*, 507 U.S. 170.  Sort of the direction of

3  the enterprise.  I just didn't see any facts suggesting

4  direction of the enterprise.

5         So those are the numerous deficiencies, any one of

6  which justifies the dismissal or requires the dismissal of Claim

7  1.  I am dismissing it with leave to amend if you can cure these

8  deficiencies.  But, again, I'm just telling you that's -- it's a

9  high hurdle and I'm not sure you can get there.

10        Count 2 is the Nevada RICO claim.  We know from Nevada

11 case law, including *Allum v. Valley Bank*, that Nevada's

12 racketeering statute is based on and is similar in many respects

13 to Federal RICO.  And, in fact, this claim is based on

14 essentially the same enterprise but a slightly different set of

15 predicate acts because the statutes are different with respect

16 to the predicate acts.  And I understand that the predicate acts

17 are basically the fraud and fraud -- or sorry -- fraud and false

18 pretenses that are pled in Claims 3 and 4.  Still, essentially

19 the facts on which these two claims are based are the same.

20        And so I find that the same deficiencies that require

21 the dismissal of the federal claim in Count 1 compels the

22 dismissal of the state claim in Count 2.  So this Claim 2, for

23 the same reasons, is dismissed with leave to amend if these

24 deficiencies can be cured.

25        That brings me to the fraud crime in Claim 3 and the

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1 false pretenses crime as alleged in Count 4.  Again, no one has

2 demonstrated for me that there are private rights of action

3 under Chapter 205 for these claims.  So what I'm gonna do here

4 is I'm going to give you leave to amend to reassert these claims

5 under the common law elements and common law claims.

6          And one more point on the Third Cause of Action against

7 White.  Again, I just don't see any false representations by

8 White that were alleged that actually tie to these alleged

9 damages.  I'm not seeing a reliance on something by White.  In

10 fact, the allegation against White -- see if I can find that

11 paragraph.

12     (Pause in the proceedings.)

13          THE COURT:  My recollection is -- and I don't -- I

14 can't find it at this moment.  But the allegation against White

15 was that he went on ESPN and he said that Lesnar was not going

16 to be returning -- I think that's what it was -- which makes no

17 sense to me in light of the fact that clearly we knew he was

18 returning and -- I'm sorry -- Hunt would have obviously known he

19 was returning based on the fact that he was going to fight him.

20 And so I just don't understand the reliance on anything by

21 White.  I'm not seeing how that would make any sense at this

22 point.  But, regardless, there's nothing pled against White to

23 satisfy or to form a basis for the fraud claim which is alleged

24 against him too.

25          So, again, I'm going to dismiss the Third and Forth

--- 2:17-cv-85-JAD-CWH - May 22, 2017 ---

1  Claims for Relief because I don't find that there is a private

2  right of action for a claim under 205.377 or 205.380 though

3  there are analogues, there are civil analogues under Nevada law

4  for those.  And -- so, to the extent that you can plead those

5  under their civil analogues, you can replead those claims.  But

6  you're gonna definitely need more facts as to White.  And you

7  will need -- well, I think that as pled you have pled some facts

8  to show reliance.  So I'm not going to ask that you supplement

9  the reliance aspect of it.  The defenses' argument is

10 essentially that when you look at the full picture of everything

11 you're going to see there's going to be evidence that cuts

12 strongly against reliance.  But I'm not going to step outside

13 the four corners of the Complaint in order to make those

14 conclusions at this point.  This is just notice pleading right

15 now.  This is 12(b)(6), it's notice pleading, and I'm not going

16 to make those kinda calls.  I have to take the plaintiff's

17 allegations as true at this point to the extent that they are

18 factually based and those are.

19      So, nevertheless, dismissing Claims 3 and 4 with leave

20 to amend to assert the actual common law basis for those claims.

21      Now, let me just make a statement though.  That doesn't

22 mean you would want to drop out -- if, if, if you are going to

23 try to replead the state RICO claim, you're going to want to put

24 those predicate acts in your state RICO claim.  So let me just

25 explain that.

─── 2:17-cv-85-JAD-CWH - May 22, 2017 ───

1          So -- but it's also entirely possible that you only

2    really meant those as predicate acts and not as separate acts

3    so -- and I think you really need to consider whether by the

4    Fourth Cause of Action you meant false pretenses or you meant

5    fraud in the inducement.  But it seems, based on our discussion,

6    you didn't mean fraud in the inducement or fraudulent

7    concealment resulting in a now-invalid contract.  So I will take

8    you at your word at this point.

9          That brings me to the contract claims.  I'm going to

10   grant the motion with respect to the Fifth Cause of Action, the

11   breach of contract claim, because I could not tell when I read

12   this Complaint what the breach was; what fact led to a breach.

13   And I think that's because you didn't identify what part of what

14   agreement got breached.  And so I'm granting leave to amend for

15   you to actually state facts to support a breach of the contract.

16   So you'll have to at least identify what the term was.

17          I am denying the motion as to the Sixth Cause of

18   Action.  That's the breach of covenant of good faith and fair

19   dealing.  I think that one's sufficiently alleged.

20          Seventh Cause of Action.  I'm on the negligence claim.

21   So there are a number of problems with this claim.  First,

22   nobody has identified a recognized duty of care for UFC.  So the

23   best that plaintiff does is in paragraph 146, which is a duty of

24   care based on contract.  But that wouldn't support a negligence

25   claim; that's entirely duplicative, essentially, of what you're

1   alleging as a contract breach.  And so this claim, it appears to

2   me, is really duplicative of the contract breach claim.

3        The assumption of risk clause in the contract I think

4   creates an affirmative defense to this entire claim as well.

5   Now that contract provision is one that was able -- because it

6   was incorporated into the Complaint, I was able to take a look

7   at it and it seems quite certain -- quite clear that these types

8   of al- -- these damages and this theory would be entirely

9   precluded by that provision.  I was going to let this survive

10  based on my original thought that you were challenging the

11  validity of the contract based on fraud in the inducement.  But,

12  since it appears that's not what's happening, that's one more

13  reason that I need to dismiss the negligence claim.

14       And, to the extent that the plaintiff has pled lost

15  opportunities as the injuries, I think recovery of those

16  injuries also would probably be barred under the economic loss

17  doctrine in Nevada.

18       So there are a number of reasons that this claim fails.

19  And, as much as I have to take the plaintiff's statements and

20  facts as pled, because I can look at that entire contract

21  because it was incorporated so substantially into the Complaint,

22  I can't overlook it and it just -- it appears to me that it

23  squarely would preclude that negligence claim.

24       That brings me to the Eighth Cause of Action, the

25  unjust enrichment claim.  This one I am going to -- okay.  So

—— 2:17-cv-85-JAD-CWH - May 22, 2017 ——

1   the -- so let me back up.

2           The negligence claim I am dismissing without leave to

3   amend.

4           The Eighth Cause of Action, unjust enrichment, this

5   one's against UFC, Lesnar, and White.  The parties' main

6   argument on this claim is that it has to be dismissed because

7   Nevada law bars an unjust enrichment claim when there's a

8   contract that governs that same conduct.  That would work for

9   UFC.  But you could also at this point allege inconsistent

10  theories.  And so I'm not going to dismiss it on that basis yet

11  although that might be a basis at summary judgment to dismiss it

12  but not at this point.  I think it's a bit premature on that

13  reason at least.

14          But there are some problems that require me to dismiss

15  this one with leave and that is Hunt has not pled any facts from

16  which I can infer that any of these defendants has retained

17  money or other benefits that rightly belong to Hunt.  The theory

18  that Hunt deserves Lesnar's purse, fight purse, which is alleged

19  in paragraph 156, and all Pay-Per-View proceeds just has no

20  connection to a right that Hunt has.  I -- based on the facts

21  pled in this Complaint, I'm jut not seeing how those are his

22  property.  And so I can't find at this point anything that would

23  suggest one of these defendants retained a right or benefit of

24  Hunt's.  So that one's dismissed with leave if you can plead

25  facts to support that theory.

─── 2:17-cv-85-JAD-CWH - May 22, 2017 ───

1          There's also simply no allegation against White in this

2    claim whatsoever, particularly that he retained anything.  So I

3    don't know what you would plead against White.  All the claims

4    against White are incredibly thin at this point.  And so you've

5    got leave to amend.  But, again, I caution you; I think some of

6    these are entirely too thin.

7          So, in short, I think what I see emerging from these

8    facts as -- these more than a hundred and fifty paragraphs of

9    facts is the general theory that UFC enforced the Anti-Doping

10   Policy inconsistently which was a breach of the implied covenant

11   of good faith and fair dealing or a breach of the contract.  I

12   think that any further tort theories or racketeering theories

13   are going to be a bit of a stretch and will probably stretch

14   those -- or possibly stretch those theories too far.

15         But, then again, the Ninth Circuit requires me to

16   liberally grant leave even if it's not even requested, and I

17   don't ultimately know what facts you left on the cutting room

18   floor.  So I'm going to give you the opportunity to amend.

19         And so, to reiterate, I'm granting the Motions to

20   Dismiss in part.  I am dismissing the claims in Count 1, 2, 3,

21   4, 5, 7, and 8 all with leave to amend, except Count 7 is not --

22   is without leave to amend because I don't think based on any set

23   of facts that the plaintiff can plead a viable claim

24   particularly in light of the assumption of the risk term in the

25   contract and the contract is not currently being alleged to be

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1   invalid.

2         So you have 10 days to file an Amended Complaint if you

3   can plead additional facts to cure these deficiencies.

4         Now, I noticed you all have a Motion to Stay Pending

5   Resolution of these Motions to Dismiss.  I think I can deny that

6   as moot right now.  It was based on the pendency of these two

7   motions which have now been ruled upon.  So that is Document 45

8   in the record, the Motion to Stay Discovery.  And I'm going to

9   deny that one without prejudice in light of the fact that we've

10  resolved these motions now.

11        Any questions?  Mr. Williams.

12        MR. WILLIAMS:  Yeah.  So, with respect to the Motion to

13  Stay Discovery, then would we be permitted -- if it's denied

14  without leave in light of the fact that we don't know what the

15  next version of the Complaint is gonna look -- we'd be permitted

16  to refile if we thought we had a basis for doing that?  I

17  understand --

18        THE COURT:  Sure.

19        MR. WILLIAMS:  -- I get the Court's --

20        THE COURT:  No.  You're right.

21        MR. WILLIAMS:  Okay.  Fair enough.  That's it.  Thank

22  you.

23        THE COURT:  You're right.

24        Anything else?

25        MR. INGOLD:  No, Your Honor.

——— 2:17-cv-85-JAD-CWH - May 22, 2017 ———

1          MR. CAMPBELL:  No, Your Honor.

2          THE COURT:  All right.

3          MR. JACOBS:  No, Your Honor.

4          THE COURT:  Again, thank you all for your preparation.

5          MR. WILLIAMS:  Thank you, Your Honor.

6          THE COURT:  And we are adjourned.

7      (Proceedings concluded at 3:06 p.m.)

8

9                        --oOo--

10                COURT REPORTER'S CERTIFICATE

11

12      I, FELICIA RENE ZABIN, Official Court Reporter, United

13  States District Court, District of Nevada, Las Vegas, Nevada, do

14  hereby certify that pursuant to 28 U.S.C. § 753 the foregoing is

15  a true, complete, and correct transcript of the proceedings had

16  in connection with the above-entitled matter.

17

18  DATED:  May 31, 2017

19                              /s/ **Felicia Rene Zabin**
                            FELICIA RENE ZABIN, RPR, CCR NO. 478
20

21

22

23

24

25