# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Mark Hunt, | Case No.: 2:17-cv-00085-JAD-CWH |
| Plaintiff | **Order Granting Defendants' Motions to Dismiss and Defendants' Motion for Leave to File Excess Pages, and Denying Defendants' Request for Judicial Notice** |
| v. | |
| Zuffa, LLC dba Ultimate Fighting Championship, et al, | [ECF Nos. 111, 113, 115, 116, 126] |
| Defendants | |

Plaintiff Mark Hunt sues Zuffa, LLC dba Ultimate Fighting Championship (UFC), its president Dana White, and mixed martial arts (MMA) fighter Brock Lesnar, alleging that UFC surreptitiously and strategically manipulated its own drug-testing requirements to allow select UFC fighters to use performance-enhancing drugs. Hunt, who claims to be a drug-free fighter, alleges that he lost at least two bouts against drug-enhanced competitors, including Lesnar, damaging his brand as an MMA fighter, stunting several of his related income streams, and physically injuring him. Hunt alleges civil violations of the federal and state Racketeer Influenced and Corrupt Organizations Act (RICO) and various state-law tort and contract claims. Except for breach of the implied covenant of good faith and fair dealing, I previously dismissed all of Hunt's claims with leave to amend[1]—cautioning Hunt that his allegations were unlikely to support his RICO and tort theories.[2]

---

[1] ECF No. 65 at 37–50 (motion-to-dismiss hearing).

[2] *Id*. at 48 ("[S]o you've got leave to amend. But, again, I caution you; I think some of these are entirely too thin."); *id.* ("So, in short, I think what I see emerging from . . . these more than a hundred and fifty paragraphs of facts is the general theory that UFC enforced the Anti-Doping Policy inconsistently[,] which was a breach of the implied covenant of good faith and fair dealing or a breach of the contract. I think that any further tort theories or racketeering theories

Hunt filed an amended and supplemental complaint,[3] and defendants now move to dismiss all claims except for Hunt's claim for breach of the covenant of good faith and fair dealing.[4]  Although Hunt has added detailed allegations to his operative complaints, his main theory of damages—that he would have won UFC 200 if Lesnar hadn't been doping—is highly speculative and thus fails to show that defendants' alleged RICO violations and fraud proximately caused Hunt's financial losses.  Hunt's remaining claims are also fatally defective.  Because Hunt has had ample opportunity to state plausible claims and remains unable to do so, I dismiss the claims challenged by defendants' motions with prejudice.  This case proceeds on Hunt's breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claim against UFC only.

## Background

UFC is the largest MMA promoter in the world, accounting for a vast majority of the sport's revenue.[5]  It has enacted an "Anti-Doping Policy" that, by its own description, aims to develop "the best anti-doping program in all of professional sports."[6]  Hunt alleges that UFC circumvents this policy through its "rampant" use of drug-testing exemptions[7] that allow select fighters to use substances banned by UFC's policy, the U.S. Anti-Doping Agency (USADA), the World Anti-Doping Agency (WADA), and the Nevada Athletic Commission (NAC).[8]  These

---

are going to be a bit of a stretch and will probably stretch those -- or possibly stretch those theories too far.").

[3] ECF Nos. 64, 109.

[4] ECF Nos. 111 (UFC/White's motion), 115 (Lesnar's motion).

[5] ECF No. 109 at 3 ¶ 12.

[6] *Id*. at 4 ¶ 14.

[7] *See id*. at 5 ¶ 17.

[8] *Id*. at 5 ¶ 20, 11 ¶ 47.

doping fighters, Hunt contends, gain a competitive advantage training for and fighting in bouts,[9] and by turning a blind eye to or even facilitating their doping, UFC profits from televised "Fight Night" events featuring star fighters who would otherwise be ineligible to compete.[10]

Hunt alleges that one such event occurred in late 2013 in a globally broadcasted UFC Fight Night in which he fought Antonio Silva.[11] Hunt claims that "Silva had a pre-existing history of using prohibited substances," but UFC nonetheless granted him a "Therapeutic Use Exemption," (TRU) which allowed Silva to use testosterone injections.[12] With UFC's assistance, Hunt alleges, Silva abused this exemption and, unbeknownst to Hunt before the bout, he "tested positive for abnormally high testosterone levels."[13] Hunt broke his hand during the bout, which was declared a draw and which Hunt claims he would have won if Silva hadn't been doping.[14] During his recovery, Hunt missed at least three fights and therefore did not earn income from them.[15]

In March 2016, Hunt fought Frank Mir, whom he claims similarly abused a TRU that UFC had granted him and "tested positive for a prohibited substance classified as an anabolic steroid."[16] Hunt doesn't reveal that bout's outcome, but he asserts that "Mir's presence in the

---

[9] *Id*. at 21 ¶ 102(g)(i), 30 ¶ 132.

[10] *Id*. at 26 ¶ 119; *see also* ECF No. 120 at 22.

[11] ECF No. 109 at 20 ¶ 102.

[12] *Id*.

[13] *Id*. at 21 ¶ 102.

[14] *Id*.

[15] *Id*.

[16] *Id*. at 20 ¶ 101.

fighter pool, aided by UFC and [White], was illegitimate and artificially inflated the fighter pool, depressing wages paid to [Hunt]."[17]

But Hunt's claims primarily stem from his bout against Lesnar in UFC Fight Night 200. In April 2016, Hunt entered into a multi-fight "promotional and ancillary rights agreement" (PARA) with UFC.[18] Under its terms, Hunt was entitled to a fixed lump sum (or "purse") per bout, regardless of whether he won or lost, and Hunt was prohibited from competing in other, non-UFC MMA fights.[19] The following month, White began discussing the possibility of Hunt competing in UFC 200 in July 2016, but continuously told Hunt to "keep it quiet . . . ."[20] Hunt was unaware at the time that White had also begun secret discussions the prior month with Lesnar, who had retired from UFC in 2011 and become a professional wrestler, to compete in UFC 200.[21] But in an ESPN interview in early June 2016, White denied that Lesnar was returning to UFC after Lesnar's name had appeared on a list of active fighters on UFC's website.[22] That same day, however, Lesnar entered into a contract to compete in UFC 200, which the organization announced the following day.[23] Shortly thereafter, Lesnar admitted during a SportsCenter interview that his negotiations with UFC had begun around March 2016.[24]

---

[17] Id.

[18] Id. at 6 ¶ 29; see also ECF No. 2-1 (sealed exhibits, including the PARA). Because Hunt incorporated the PARA by attaching it to his complaint as an exhibit, I considered its content in ruling on defendants' original motions to dismiss. ECF No. 65 at 39. I continue to consider it.

[19] ECF No. 109 at 6 ¶ 29, 8 ¶ 32.

[20] Id. at 12–13 ¶¶ 57, 61, 63.

[21] Id. at 11–12 ¶¶ 50, 59.

[22] Id. at 12–13 ¶¶ 60, 67.

[23] Id. at 13–14 ¶¶ 68–69.

[24] Id. at 14–15 ¶ 73.

The crux of Hunt's claims is that White and UFC intentionally concealed Lesnar's return between March and June to help him circumvent its Anti-Doping Policy and to conceal the fact that Lesnar was training with performance-enhancing drugs.[25] Hunt points to a section of the policy applicable to retired fighters like Lesnar who return to compete in UFC, requiring them to submit to drug "[t]esting for a period of four months" before resuming fighting.[26] The policy also provides a testing exemption for "exceptional circumstances . . . ." Although not fully clear from the complaint, it appears that UFC granted Lesnar this exemption in June.[27] Hunt expressed concern to White that month that this exemption was being used to allow Lesnar to get any banned substances "out of his system" prior to him being tested for UFC 200.[28] White assured Hunt in response that Lesnar would be sufficiently drug tested, stating: "USADA is testing the sh-- outta [Lesnar] as we speak" and that "[h]e will be the most tested athlete on this card[.] Th[ey] are ALL OVER HIM."[29] Hunt, however, claims that White and UFC held off executing and announcing the bout agreement with Lesnar until a month before UFC 200— rather than in March—as a pretense for granting Lesnar the exemption to the four-month testing period.[30]

---

[25] *Id*. at 5 ¶ 20.

[26] *Id*. at 11 ¶ 51.

[27] *See id*. at 16 ¶ 78 (Hunt writing to White, asking "wats [sic] this waiver that Lesnar is getting from [USADA]" and "why is he exempt from testing for 4 months wen [sic] everyone has to"), 17 at ¶ 79 ("[T]he NAC requested further information from UFC justifying the LESNAR drug testing retirement exemption.").

[28] *Id*. at 16–17 at ¶ 78.

[29] *Id*.

[30] *See id*. at 17–18, ¶¶ 80–81, 85–89.

On June 28, Lesnar provided USADA a urine sample.[31] UFC had the option of paying a nominal fee to expedite the testing and receive the results within three days—ensuring they would arrive before UFC 200—but did not do so.[32] On July 9, the day of the bout, Lesnar provided another urine sample.[33] In a unanimous decision, Lesnar defeated Hunt, who sustained undescribed "severe physical injury" during the bout.[34] Over the next two weeks, the results returned from Lesnar's two urine samples, revealing banned substances in his system that are "used after a period of strength training with anabolic steroids or similar prohibited substances."[35] As a result, Lesnar's victory was overturned at some point and declared a "no contest."[36]

Hunt filed this suit in early 2017, claiming that he lost UFC 200 because of defendants' alleged scheme to conceal Lesnar's use of performance-enhancing drugs and that he consequently incurred a variety of financial losses.[37] Hunt nonetheless continued to fight for UFC and was scheduled to compete in UFC Fight Night 121 in November 2017.[38] In his supplemental complaint, Hunt alleges that UFC removed him from the event, citing "medical concerns."[39] He claims that this excuse was pretextual and that he was removed in retaliation for filing suit and for publishing an article the prior month accusing defendants of being part of a

---

[31] *See id.* at 18 ¶ 89.

[32] *Id.* at 18 ¶¶ 89–91.

[33] *Id.* at 19 ¶ 95.

[34] *Id.* at 5 ¶ 21, 19 ¶¶ 93–94.

[35] *Id.* at 5 ¶ 20, 19 ¶¶ 95–96.

[36] *Id.* at 19 ¶ 99.

[37] ECF No. 1.

[38] ECF No. 109 at 27–28 ¶ 125.

[39] *Id.*

doping scheme. By missing the bout, Hunt was deprived of its purse and claims to have wasted more than $100,000 he spent on an MMA training camp in preparation for UFC 121.[40]

### Legal standard

Federal Rule of Civil Procedure 8 requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[41] While Rule 8 does not require detailed factual allegations, the properly pled claim must contain enough facts to "state a claim to relief that is plausible on its face."[42] This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; the facts alleged must raise the claim "above the speculative level."[43] In other words, a complaint must make direct or inferential allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[44]

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss. The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[45] Mere recitals of a claim's elements, supported by only conclusory statements, are insufficient.[46] The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[47] A claim is facially plausible when the complaint alleges facts that

---

[40] *Id.*

[41] Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[42] *Twombly*, 550 U.S. at 570.

[43] *Iqbal*, 556 U.S. at 678.

[44] *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)).

[45] *Iqbal*, 556 U.S. at 678–79.

[46] *Id.*

[47] *Id.* at 679.

allow the court to draw a reasonable inference that the defendant is liable for the alleged

misconduct.[48]  A complaint that does not permit the court to infer more than the mere possibility

of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be

dismissed.[49]

## Discussion

Defendants move to dismiss nine of the ten claims in Hunt's operative complaints:

violations of the federal and Nevada RICO statutes; common-law fraud and aiding and abetting;

breach of contract; unjust enrichment; battery and aiding and abetting; and civil conspiracy.  I

address each in turn.

**I.    Hunt's federal and state RICO claims fail because he has either pled non-cognizable damages or failed to plead facts to show that defendants' actions proximately caused his financial losses.**

Under both the federal and state RICO statutes, it is a crime "to use or invest" the

"income derived, directly or indirectly, from racketeering activity."[50]  Both statutory schemes

also "provide[] a private right of action for '[a]ny person injured in his business or property' by a

RICO violation."[51]  "To state a civil RICO claim, plaintiffs must allege (1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs'

'business or property.'"[52]  Under both federal and state law, a person engages in a pattern of

---

[48] *Id.*

[49] *Twombly*, 550 U.S. at 570.

[50] 18 U.S.C. § 1962(a); Nev. Rev. Stat. § 207.400(1)(a).

[51] *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008) (alteration in original) (quoting 18 U.S.C. § 1964(c)); *Allum v. Valley Bank of Nevada*, 849 P.2d 297, 298 (Nev. 1993) (citing Nev. Rev. Stat. § 207.470(1)).

[52] *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (quoting 18 U.S.C. § 1964(c)); *see also Allum*, 849 P.2d at 299 ("We conclude that for a plaintiff to recover under Nevada RICO, three conditions must be met: (1) the plaintiff's injury must flow from the defendant's violation of a predicate Nevada RICO act; (2) the injury must be proximately caused by the defendant's

racketeering activity by committing at least two enumerated predicate criminal acts within a specified timeframe.[53]  But to recover civilly for a RICO violation, a plaintiff must establish that he has statutory standing by demonstrating "(1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation."[54]

Defendants argue that multiple defects preclude Hunt's RICO claims.  Because I find that Hunt's alleged damages fail to establish RICO standing, I address only that threshold issue under federal and state law.[55]  And because his RICO retaliation claim stems from a different theory of damages than the damages related to his bouts against doping fighters, I address those portions of his claim separately.

### A.  Bouts against doping fighters

Hunt attributes his damages to his bouts against three fighters who allegedly used performance-enhancing drugs: Silva, Mir, and Lesnar, but he fails, under the first standing prong, to identify a qualifying harm that resulted from either of the first two fights.  In the fight against Silva, Hunt claims he injured his hand.  But the Ninth Circuit has held that "[p]ersonal injuries

---

[53] violation of the predicate act; and (3) the plaintiff must not have participated in the commission of the predicate act.").

[53] 18 U.S.C. § 1961(1), (5); Nev. Rev. Stat. §§ 207.360, .390.

[54] *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see also Allum*, 849 P.2d at 299.

[55] The Nevada Supreme Court has recognized that the Nevada "legislature patterned Nevada RICO after" the federal RICO scheme and has therefore relied on federal case law in interpreting Nevada RICO.  *Allum*, 849 P.2d at 301; *see also, e.g, id*. at 299 ("Having reviewed the Nevada statutory scheme as well as federal court interpretations of RICO, we conclude that for a plaintiff to recover under Nevada RICO, three conditions must be met . . . .").  Given this fact and Hunt's failure to highlight any pertinent distinctions between the federal and state statutory schemes, my analysis will apply to both RICO claims under counts one and two.

are not compensable under RICO."[56]  Although Hunt alleges that he lost income from not being able to fight while recovering from this injury, "courts have been clear that even the economic consequences of personal injuries are not compensable under RICO."[57]  As for the fight against Mir, Hunt's allegation that "Mir's presence in the fighter pool . . . artificially inflated the fighter pool" and thus depressed Hunt's wages is vague and abstract and therefore fails to allege a "concrete financial loss."[58]  So Hunt has not pled facts to establish RICO standing for the Mir bout either.

I therefore turn to the main thrust of Hunt's claim: his loss to Lesnar in UFC 200.  I dismissed the RICO claims stemming from this fight in Hunt's original complaint because he failed to identify a concrete financial loss, alleging only "damage to his reputation" and "lost opportunity of career advancement. . . ."[59]  Hunt describes more specific damages in his amended operative complaints, including six promotional events that he was scheduled to appear at after UFC 200 but which the promoters cancelled allegedly because Hunt lost the bout, thus costing him over $90,000 in appearance fees.[60]  He also alleges that his loss to Lesnar caused a dip in traffic to his social-media accounts and website, resulting in diminished advertising revenue.[61]  He similarly claims lost licensing fees from his apparel label and a drop in sales of

---

[56] *Ove*, 264 F.3d at 825.

[57] *Allman v. Philip Morris, Inc.*, 865 F. Supp. 665, 668 (S.D. Cal. 1994) (citing *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992)).

[58] *Canyon County*, 519 F.3d at 975 ("Our circuit requires that a plaintiff asserting injury to property allege 'concrete financial loss.'").

[59] ECF No. 1 at 13 ¶ 78; ECF No. 65 (transcript of motion-to-dismiss hearing).

[60] ECF No. 109 at 24 ¶ 112.

[61] *Id*. at 24–25 ¶ 113.

his book.[62]  Defendants assert a variety of reasons that these allegations fail to show a cognizable injury to Hunt's business or property.  But I do not reach those arguments because I find that, under the second standing prong, Hunt's allegations fail to establish that defendants' actions proximately caused his damages.

### 1.    *RICO proximate cause requires a direct and precise causal link.*

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."[63]  To aid in that analysis, the Ninth Circuit has developed "three nonexhaustive factors" that address "whether the injury is 'too remote' to" establish causation:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.[64]

The first factor reflects a line of anti-trust and RICO cases in which "the Supreme Court clarified that potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing."[65]  For instance, in *Holmes v. Securities Investor Protection Corp.*, the Court held that the government-chartered corporation tasked with covering consumer claims when securities broker-dealers fail did not have statutory

---

[62] *Id.* at 25–26 ¶¶ 114–16.

[63] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

[64] *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) (quoting *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001)).

[65] *Id.* at 1168–69; *see also id.* at 1170 ("Turning to the first factor, taking the allegations in the complaint as true, we are unable to discern a more direct victim of the illegal conduct.  The documented employees here do not complain of a passed-on harm.").

standing to sue a group of individuals who had allegedly engaged in a fraudulent stock-manipulation scheme that ultimately resulted in the plaintiff-entity expending millions of dollars in claims coverage.[66]  It reasoned that the link was "too remote" between the stock manipulation, which most directly injured the broker-dealers that failed as a result of the scheme, and the plaintiff.[67]  By contrast, Hunt, as a non-doping fighter allegedly induced by fraud into fighting a drug-enhanced competitor, is a direct victim of defendants' scheme of allowing or facilitating doping.  Indeed, Hunt and clean fighters like him are perhaps the most direct victims in such doping schemes.  This factor therefore weighs in Hunt's favor, but it is not dispositive of this inquiry.[68]

The second factor addresses the "speculative nature of" the harm alleged.[69]  The Ninth Circuit has admonished that "courts must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff."[70]  "Where the violation is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking."[71]  This "directness requirement"[72] stems from "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote

---

[66] *Holmes*, 503 U.S. at 261–63.

[67] *Id.*

[68] *See Canyon County*, 519 F.3d at 983 & n.13.

[69] *Mendoza*, 301 F.3d at 1170; *see also Marceau v. Int'l Bhd. of Elec. Workers*, 618 F. Supp. 2d 1127, 1167 (D. Ariz. 2009)).

[70] *Canyon County*, 519 F.3d at 981 (citing *Anza*, 547 U.S. at 456–58).

[71] *Id.*

[72] *Sybersound Records*, 517 F.3d at 1148.

action"[73] and "the speculative nature of the proceedings that would follow" from attempting to determine what portion of these damages is attributable to the alleged RICO damages.[74]

In *Canyon County v. Syngenta Seeds*, an Idaho county brought a RICO claim against a group of companies that allegedly "engaged in an illegal scheme of hiring and/or harboring undocumented immigrant workers within the County," which the County claimed caused it to expend millions of additional dollars in public services.[75] The Ninth Circuit found proximate cause lacking because "the cause of the plaintiff's asserted harms [was] a set of actions (increased demand by people within [the] County for public health care and law enforcement services) *entirely distinct* from the alleged RICO violation (the defendants' knowing hiring of undocumented workers)."[76] "[T]he asserted causal chain," the court reasoned, was "quite attenuated," as "there [were] numerous other factors that could [have led] to higher expenditures by the County."[77] "The causal chain would also be difficult to ascertain because there [were] numerous alternative causes that might [have been] the actual source or sources of the County's alleged harm."[78] "Given the substantial—and fatal—shortcomings of the complaint in meeting [the] proximate cause requirements," the Ninth Circuit upheld dismissal of the County's RICO claims.[79]

---

[73] *Id.* (quoting *Anza*, 547 U.S. at 458).

[74] *Canyon County*, 519 F.3d at 981 (quoting *Anza*, 547 U.S. at 459).

[75] *Id.* at 971.

[76] *Id.* at 982 (emphasis added).

[77] *Id.*

[78] *Id.* at 983 ("Increased demand for public health care and law enforcement may result from such varied factors as: demographic changes; alterations in criminal laws or policy; changes in public health practices; shifts in economic variables such as wages, insurance coverage, and unemployment; and improved community education and outreach by government.").

[79] *Id.*

## 2. *Hunt's RICO claims falter at the proximate-cause hurdle.*

Like the RICO claims in *Canyon County*, Hunt's are fatally speculative. The financial damages that Hunt alleges—the cancelled appearances and decreased advertising revenue, licensing fees, and book sales—are "entirely distinct" from defendants' alleged RICO violations—using fraudulent means to allow doping fighters to compete in UFC fights. Indeed, Hunt's alleged damages are premised on a multi-part chain of causation, in which he presupposes, for instance, that his paid appearances would not have been cancelled had he not lost UFC 200 and that he would have won the bout—or at least suffered a "less lopsided" loss— had Lesnar not been allowed to dope.[80] Hunt rejects this characterization of his claim, contending that it is not limited to the proposition that he would have *won* the bout and that, had he known Lesnar was doping, he could have better "protected his interests" by declining to fight or negotiating a more lucrative contract.[81] But Hunt himself argues that "fighting a cheating fighter is precisely what caused [his] damages"[82]—confirming that his causation theory is premised on the fact that he fought and lost to Lesnar.

Turning to the first link in this chain, the question of how the bout would have turned out is entirely speculative. Although Hunt contends that "[i]t is not speculative to say that doping fighters like Lesnar are bigger, stronger, faster, hit harder, and can handle damaging hits better,"[83] this argument misses the forest for the trees. As with the claim in *Canyon County* that the surge of undocumented workers *caused* great public expenditures, there are "numerous other factors" that could account for why Hunt lost the bout or why it was (in Hunt's view) such a

---

[80] ECF No. 109 at 5–6 ¶ 23; ECF No. 118 at 2, 9.

[81] ECF No. 120; ECF No. 109 at 26 ¶ 117; *see also id.* at 5–6 ¶ 23.

[82] ECF No. 120 at 10.

[83] ECF No. 118 at 9.

lopsided defeat.  Lesnar, for instance, could have simply been a superior fighter or used a combination of mixed martial arts well suited to parry Hunt's fighting style.  Or Hunt could have just had an off night.  Regardless, it is impossible to determine how a fighter will fare absent unfair advantages like doping and who will ultimately win a bout.

The second link in the chain—Hunt's allegation that his UFC 200 loss caused his financial harms—is also speculative.  For instance, Hunt offers the conclusory allegation that the organizers of the various events he was scheduled to attend cancelled his paid appearances because he lost the bout to Lesnar.[84]  As an initial matter, though Hunt alleges that all the events were scheduled to occur after UFC 200, he never reveals whether his appearances were scheduled and cancelled before or after the bout.  While I am willing to infer on a motion to dismiss that all the appearances were cancelled after UFC 200 and that this ambiguity is the result of an inadvertent omission, it is troubling that Hunt has failed to address this issue in his oppositions to the pending motions given that they both highlight it.[85]

But even if I infer that these appearances were scheduled before UFC 200 and cancelled after the bout, Hunt has provided no detail why he believes the two issues are related, such as what the organizers may have told him regarding the cancellations.  Although Hunt also provides a list of paid appearances that he successfully made before UFC 200, there are numerous factors that distinguish the two sets of events and that could have resulted in the post-fight cancellations.  For instance, the organizers for both sets of events were not the same, UFC 200 was not the first bout Hunt had ever lost (even to an allegedly doped fighter), and the fact that Lesnar was doping was revealed less than a week after the bout and well before most of these events were scheduled

---

[84] ECF No. 109 at 24 ¶ 112.

[85] ECF Nos. 111 at 18–19, 115 at 8.

to occur. These factors demonstrate that the causal connection between Hunt's loss at UFC 200 and the cancelled appearances is highly attenuated and speculative.

The same types of defects plague the alleged dips in Hunt's website/social-media traffic (and resulting revenue), licensing fees, and book sales. As Lesnar argues, the fact that his UFC 200 win was overturned due to doping and the resulting "barrage of public statements" that Hunt made on the matter may have ultimately increased Hunt's public exposure and online traffic.[86] This conclusion is speculative, but it also demonstrates the degree of uncertainty underlying Hunt's damages claim.

Confronted by these proximate-cause defects, Hunt argues that he should be allowed to offer expert testimony at trial to establish "the impact Lesnar's cheating had on the UFC 200 fight, and, as a result, on Hunt's business and property interests."[87] He also contends that causation disputes cannot be decided at the motion-to-dismiss stage. In support of both propositions, he cites the Ninth Circuit's decisions in *Mendoza v. Zirkle Fruit Co.*[88] and *Knevelbaard Dairies v. Kraft Foods, Inc.*,[89] in which the court reversed dismissals of a RICO and anti-trust action, respectively. Both cases are unavailing for two reasons. First, they were decided before the heightened pleading standard adopted in *Iqbal* and *Twombly*, and the Ninth Circuit therefore merely addressed whether it was "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[90] It is unclear whether

---

[86] ECF No. 115 at 9.

[87] ECF No. 120 at 10; *see also* ECF No. 118 at 10.

[88] *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002).

[89] *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000).

[90] *Mendoza*, 301 F.3d at 1167 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *Knevelbaard Dairies*, 232 F.3d at 984; *see also Walters v. McMahen*, 684 F.3d 435, 442 (4th Cir.

*Mendoza* and *Knevelbaard Dairies* would be decided differently under today's heightened plausibility standard.

But more importantly, both cases are materially distinguishable from Hunt's case and do not stand for the overly-broad proposition that deficiencies in causation cannot be addressed until expert testimony is introduced at the summary-judgment stage or trial. In *Mendoza*, "legally documented agricultural workers" sued their employers—a pair of fruit-growing companies— alleging that the companies "depressed their salaries by conspiring to hire undocumented workers at below market wages."[91] In concluding that the plaintiffs adequately alleged causation, the Ninth Circuit rejected the district court's "conclusion that factors other than the scheme coupled with the growers' power in the relevant labor market *could* account for the plaintiffs' depressed wages," highlighting the fact that the plaintiffs had "allege[d] that the growers singularly have the ability to define wages in this labor market, akin to monopsony or oligopsony power."[92] The court admonished that the plaintiffs had to be "allowed to make their case through presentation of evidence, including experts who [would] testify about the labor market, the geographic market, and the effects of the illegal scheme. Questions regarding the relevant labor market and the growers' power within that market are exceedingly complex and best addressed by economic experts and other evidence at a later stage in the proceedings."[93]

---

2012) ("As the decisions in *Twombly* and *Iqbal* have made clear, the standard employed in *Mendoza* no longer is applicable.").

[91] *Mendoza*, 301 F.3d at 1166.

[92] *Id.* at 1171.

[93] *Id.*

In reaching this conclusion, the Ninth Circuit relied in part on *Knevelbaard Dairies*,[94] in which it addressed an anti-trust action brought by a group of milk producers who "claim[ed] that the defendant cheese makers conspired successfully to depress the prices they paid for milk produced in California."[95] The plaintiffs alleged that these cheese makers illegally fixed "the price for bulk cheese in order to depress their acquisition costs both for that commodity and for milk," thereby harming the plaintiffs.[96] The Ninth Circuit rejected the conclusion that this alleged harm was speculative, stating that "[w]hether experts will be able to measure the difference between the allegedly restrained price for milk and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations . . . ."[97]

Both *Mendoza* and *Knevelbaard Dairies* thus addressed the effect that illegally manipulating the cost of inputs—labor and raw goods respectively—would have on the market for specific commodities. This is an empirical analysis and the type of forecasting that economists and business analysts perform regularly. And although these types of professionals might disagree about the results the data might yield, that battle of experts is why such claims— brought as either a RICO or anti-trust action—may be appropriate for trial. But that does not mean that the mere possibility of expert testimony down the line can rehabilitate allegations that insufficiently establish proximate causation. *Canyon County*, after all, was an appeal taken from a successful motion to dismiss. And in *Mendoza*, the plaintiffs alleged that the growers had

---

[94] *Id.*

[95] *Knevelbaard Dairies*, 232 F.3d at 982.

[96] *Id.*

[97] *Id.* at 991.

18

significant market power, a premise that could allow a court to plausibly conclude that the growers could affect market wages and that could be supported by expert testimony at trial.

By contrast, Hunt has failed to allege facts that would allow me to conclude that the alleged doping scheme caused the financial harms he suffered. Each link in his chain of causation is speculative, and its core premise—that Hunt would have won the bout if Lesnar hadn't been doping—is impossible to prove. I find that this flaw is fatal to establishing proximate causation, and I therefore do not address the final remoteness factor.[98]

Because I cautioned Hunt when I dismissed his RICO claims under his original complaint that his allegations were too speculative,[99] and because he's had multiple attempts to cure this defect (including an amended and supplemental complaint), I dismiss with prejudice this portion of his federal RICO claim under count one and the entirety of his Nevada RICO claim under count two.

## B. Retaliation

I next turn to the second part of Hunt's federal RICO claim, which is premised on his allegation that White and UFC removed him from UFC 121 in retaliation for filing this action. Hunt added this allegation to his supplemental complaint under a heading of "factual allegations common to all causes of action,"[100] but it wasn't clear that Hunt was asserting a distinct RICO claim until he filed his opposition to UFC's motion to dismiss. In that briefing, he argues that the alleged retaliation violated 18 U.S.C. § 1513,[101] which criminalizes retaliating against a

---

[98] *See Canyon County*, 519 F.3d at 983 (addressing only whether the harm alleged was speculative because the complaint's "shortcomings" as to this factor were "fatal").

[99] *See supra* n.2.

[100] ECF No. 109 at 9, 27.

[101] ECF No. 120 at 13–14.

witness to "an official proceeding"[102] and which is a predicate act under the federal RICO

scheme.[103]  Because Hunt failed to make any reference to § 1513 or its content in his

supplemental complaint, he has not sufficiently given defendants notice of his claim.  This alone

is grounds for dismissal.

Although the Ninth Circuit employs a liberal amendment policy, allowing one here

would be futile.[104]  Section 1513 is violated when a person "engages in any conduct and thereby

causes bodily injury to another person or damages the tangible property of another

person . . . ."[105]  Hunt hasn't alleged that defendants caused either form of harm by pulling him

from UFC 121.  While he claims that he was physically injured in his fight against Lesnar, this

allegation is distinct from the allegation that he was prevented from fighting more than a year

and a half later.  And although Hunt alleges that this retaliation caused him to waste $100,000 in

training-camp costs, this financial loss doesn't constitute damage to "tangible property."[106]  I

therefore dismiss the remainder of Hunt's federal RICO claim with prejudice.

---

[102] 18 U.S.C. § 1513(b)(1).

[103] 18 U.S.C. § 1961(1) ("'[R]acketeering activity' means . . . any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1513 (relating to retaliating against a witness, victim, or an informant) . . . .").

[104] *See Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) (stating that leave to amend "is properly denied . . . if amendment would be futile").

[105] 18 U.S.C. § 1513.

[106] *See Witt v. Snider*, No. 16-CV-01303-MSK-CBS, 2017 WL 2215252, at *8 (D. Colo. May 19, 2017) ("The statute expressly refers to threats of 'bodily injury' and 'damage [to] tangible property,' and although Mr. Witt has copiously alleged the Defendants' intention to violate his intangible property—that is, [his interest in a company]—he offers no allegations that the Defendants damaged or threatened to damage any tangible property belonging to him."); *Tangible Property*, *Black's Law Dictionary* (10th ed. 2014) ("Property that has physical form and characteristics").

## II. The lack of proximate causation also precludes Hunt's common-law fraud and aiding-and-abetting claims.

Hunt also claims that White's assurances to him leading up to UFC 200 that Lesnar was being extensively tested for drugs constitute common-law fraud.[107] And he alleges that each of the defendants aided and abetted in the fraudulent acts that made up the doping scheme.[108] To establish fraud, a plaintiff must prove that (1) the defendant made a false, material representation that; (2) the defendant knew to be false; (3) the defendant intended the plaintiff to rely on this misrepresentation; (4) the plaintiff relied on this misrepresentation to his detriment; and (5) "the misrepresentation proximately caused damages."[109] Defendants offer a number of reasons why Hunt's allegations fail to satisfy these elements, such as contending that representations like "USADA is testing the sh-- outta" Lesnar are non-quantifiable and therefore not actionable representations.[110] But I decline to parse each statement White made and instead dismiss this claim (under count three) with prejudice because, as discussed above, Hunt has failed to show that the alleged doping scheme—which included White's representations to Hunt[111]—were the proximate cause of his damages. And because civil aiding and abetting

---

[107] ECF No. 109 at 37.

[108] *Id.* at 38.

[109] *Chen v. Nev. State Gaming Control Bd.*, 994 P.2d 1151, 1152 (Nev. 2000).

[110] ECF No. 111 at 27.

[111] Indeed, it appears that Hunt alleges that White's statements constituted wire fraud and were therefore one of the predicate acts underlying his federal RICO claim. ECF No. 109 at 27 ¶ 123.

requires that the substantive tort be accomplished[112]—a fact Hunt acknowledges[113]—I also dismiss this separate claim under count four.

### III. Hunt's breach-of-contract claim fails because he received the compensation he was contractually entitled to and his remaining financial losses are consequential damages, which are precluded under his contract with UFC.

Hunt also revives his breach-of-contract claim, which I originally dismissed because he failed to cite what portions of the PARA or the UFC 200 bout agreement he believed were breached.[114] Hunt now claims that, by allowing or facilitating doping, UFC violated several NAC regulations and therefore breached the provision of the PARA[115] in which UFC agreed to "comply with and be bound by the rules and regulation of the [Nevada] Athletic Commission."[116] But even if defendants breached the PARA, Hunt was entitled under this contract only to a fixed purse regardless of whether he won the bout—a fact he acknowledges in his complaint.[117] Because it is undisputed that Hunt received this purse, his claim appears to be based on alleged financial losses that accrued after he lost the bout.[118] These losses constitute

---

[112] *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), *disapproved of on other grounds in GES, Inc. v. Corbitt*, 21 P.3d 11 (Nev. 2001).

[113] ECF No. 120 at 16.

[114] ECF No. 65 at 45.

[115] Hunt also asserts that UFC breached the bout agreement, but he only references a provision of this contract incorporating the PARA. ECF No. 109 at 40 ¶ 180. He therefore doesn't allege an independent breach of the bout agreement.

[116] ECF No. 109 at 40–41 ¶¶ 180–82.

[117] ECF No. 109 at 8 ¶ 32; ECF No. 2-1 at 9–12.

[118] *Century Sur. Co. v. Andrew*, 432 P.3d 180, 183 (Nev. 2018) (defining contract damages).

consequential damages,[119] which the PARA expressly precludes.[120]  I therefore dismiss this claim under count five with prejudice.

## IV.  Because Hunt's claim stems from his contracts with UFC, an unjust-enrichment claim is not available.

Next, Hunt re-alleges his unjust-enrichment claim.  "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'"[121]  A plaintiff attempting to recover "in quantum meruit" under an unjust-enrichment claim must "demonstrate that the defendant received a benefit from services provided."[122]  I previously dismissed this claim because Hunt failed to allege that any of the defendants had "retained money or other benefits that rightly belong to" him.[123]  Hunt now alleges that defendants were unjustly enriched because he provided services exceeding the scope of his contracts with UFC by fighting a drug-enhanced fighter during UFC 200.[124]  He therefore claims that he should, in

---

[119] *Id.* at 186 ("Consequential damages 'should be such as may fairly and reasonably be considered as arising naturally, or were reasonably contemplated by both parties at the time they made the contract.'").

[120] ECF No. 127 at 16 (citing ECF No. 2-1 at 15).

[121] *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) (quoting *Unionamerica Mtg. v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981)).

[122] *Id.*

[123] ECF No. 65 at 47.

[124] ECF No. 109 at 43 ¶¶ 195–201.

equity, receive Lesnar's purse and UFC's profits from the bout[125] and that he "need not prove an entitlement to the benefits conferred on Defendants."[126]

Hunt misconstrues the purpose of quantum meruit under an unjust-enrichment claim, which "implies a quasi-contract"[127] in "situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain . . . ."[128] Quantum meruit is therefore inapplicable when, as here, a contract exists.[129] And although Hunt argues that his services exceeded the scope of the contracts, his claim stems from these contracts and an equitable remedy is therefore unavailable under Nevada law.[130] Accordingly, I dismiss this claim under count seven with prejudice.

## V. Hunt's battery and aiding-and-abetting claims fail because he consented to fight Lesnar and fails to allege that Lesnar's conduct exceeded "the range of the ordinary activity" during an MMA bout.

Hunt also asserts a civil-battery claim against Lesnar stemming from his injuries during their bout and a related aiding-and-abetting claim against UFC and White. A person is liable for battery if he "(1) intended to cause harmful or offensive contact, and (2) such contact did

---

[125] *Id.* at 43–44 at ¶ 203.

[126] ECF No. 120 at 19 (emphasis omitted).

[127] *Certified Fire Prot. Inc.*, 283 P.3d at 257.

[128] *Leasepartners Corp. v. Robert L. Brooks Tr.*, 942 P.2d 182, 187 (Nev. 1997).

[129] *Id.* (citing *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824 (Nev. 1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.")).

[130] *See Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 432 N.E.2d 999, 1002 (Ill. App. Ct. 1982) ("Plaintiff asserts [that] its complaint states a valid cause of action in quasi-contract despite the existence of a contract because the contract does not cover the specific service plaintiff rendered—the development of the design changes. It is perhaps true that the contract did not expressly cover the design changes, but it does not follow that an action in quasi-contract is therefore allowable. If a quasi-contract action could be brought every time a party under contract performs a service not precisely covered by the contract, then the rule preventing quasi-contract actions when a contract exists would have little meaning.").

occur."[131]  But "[c]onsent negates the existence of the tort and, therefore, denies liability."[132]  "To be effective, consent must be (a) by one who has the capacity to consent and (b) to the particular conduct, or to substantially the same conduct."[133]

Defendants argue that Hunt expressly consented to the fight under the assumption-of-risk clause in the PARA.[134]  Hunt responds that Lesnar cannot rely on this provision to establish consent because Lesnar is not a party to the PARA and therefore lacks privity.[135]  Hunt, however, conflates his cause of action, which sounds in tort, with the source of his express consent: the PARA.  But even if the PARA did not establish his express consent to fight Lesnar, it is well established that "[o]ne who enters into a sport, game[,] or contest may be taken to consent to physical contacts consistent with the understood rules of the game."[136]  "Thus, the boxer who steps into the ring consents to his opponent's jabs,"[137] and likewise, Hunt implicitly consented to Lesnar's blows.

Hunt counters that his fight with Lesnar exceeded the scope of his consent, which he contends didn't extend to fighting a doping fighter.[138]  But the fact that Lesnar allegedly violated the rules of the sport does not automatically negate Hunt's consent.  In the California Supreme

---

[131] *Switzer v. Rivera*, 174 F. Supp. 2d 1097, 1109 (D. Nev. 2001) (citing Restatement (Second) of Torts § 13 (1965)).

[132] *Prell Hotel Corp. v. Antonacci*, 469 P.2d 399, 401 (Nev. 1970).

[133] *Davies v. Butler*, 602 P.2d 605, 612 (Nev. 1979) (ellipses omitted) (quoting Restatement (Second), Torts § 892A (1979)).

[134] ECF No. 111 at 24; ECF No. 2-1 at 18.

[135] ECF No. 118 at 21.

[136] *Avila v. Citrus Cmty. Coll. Dist.*, 131 P.3d 383, 395 (Cal. 2006) (quoting Prosser & Keeton, *Torts* § 18 (5th ed. 1984)).

[137] *Id.*

[138] ECF No. 118 at 24.

Court's widely cited decision in *Avila v. Citrus Community College District*, a baseball batter claimed that the pitcher intentionally threw the pitch at his head, which he argued exceeded his assumption of risk.[139] Acknowledging that this pitch "is forbidden by the rules of baseball," the court held that being hit by a pitcher, even intentionally, "is an inherent risk of baseball."[140] So, although an "athlete does not assume the risk of a coparticipant's intentional or reckless conduct 'totally outside the range of the ordinary activity involved in the sport,'" the pitcher's intentional throw did not fall outside of this range.[141]

Like that intentional throw, the fact that Lesnar was allegedly doping violated the bout rules established by UFC and the NAC but does not alone establish that his conduct exceeded the ordinary range of activity in an MMA fight. As Hunt's own allegations demonstrate, doping is an unfortunately common issue in MMA and was a risk he perceived. And although he argues that doping empowered Lesnar to move faster and hit harder, Hunt doesn't allege that Lesnar's conduct during the bout was somehow atypical—such as throwing Hunt out of the octagon or using "packed gloves" or a weapon. Nor does Hunt claim that his injuries exceeded those typical of an MMA bout. Accordingly, I find that Hunt consented to his fight with Lesnar, which precludes civil-battery liability. I therefore dismiss with prejudice this claim against Lesnar under count eight and the aiding-and-abetting claim against UFC and White under count nine.

---

[139] *Avila*, 131 P.3d at 385–86, 395. Although the California Supreme Court primarily addressed assumption of risk in the context of a negligence claim, the court applied its analysis to the question of consent to demonstrate that allowing the plaintiff to amend his complaint to add a battery claim would be futile. *Id*. at 395.

[140] *Id*. at 393–94.

[141] *Id*. at 394.

**VII. Because I dismiss Hunt's fraud and battery claims, he cannot maintain a civil-conspiracy claim.**

Finally, Hunt asserts a claim for civil conspiracy for fraud and battery. "Actionable civil conspiracy arises where two or more persons undertake some concerted action with the intent 'to accomplish an unlawful objective for the purpose of harming another,' and damage results."[142] A conspiracy action must be based on the agreement to commit a viable tort.[143] Because I have dismissed Hunt's underlying fraud and battery claims, I must also dismiss his civil-conspiracy claim under count ten.

\* \* \*

In sum, I grant defendants' motions to dismiss and dismiss all of Hunt's claims with prejudice, except for his claim under count six for breach of the implied covenant of good faith and fair dealing, which no defendant challenges. Because Hunt brings this claim only against UFC, I dismiss White and Lesnar in this action. Finally, I order Hunt and UFC to attend a mandatory settlement conference with a magistrate judge.

**VIII. Miscellaneous matters**

UFC and White move for additional pages for their reply brief to Hunt's opposition to their motion to dismiss.[144] Good cause appearing, I grant this motion nunc pro tunc.

UFC and White have also requested judicial notice for a variety of documents that are either not judicially noticeable or not relevant to my disposition of the pending motions.[145] I

---

[142] *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 335 P.3d 190, 198 (Nev. 2014) (quoting *Consol. Generator–Nev., Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998)).

[143] *Philip v. BAC Home Loans Servicing*, LP, 644 F. App'x 710, 711 (9th Cir. 2016) (unpublished) (citing *Eikelberger v. Tolotti*, 611 P.2d 1086, 1088 (Nev. 1980)).

[144] ECF No. 126.

[145] ECF Nos. 113, 116.

therefore deny these requests. However, the transcript of the May 22, 2017, hearing is part of the record and the PARA was incorporated into Hunt's original complaint, so I need not take judicial notice of these documents to consider them.

## Conclusion

Accordingly, IT HEREBY ORDERED that:

- The **motions to dismiss [ECF Nos. 111, 115] are GRANTED**. All of Hunt's claims, except for breach of the implied covenant of good faith and fair dealing under count six, are **dismissed with prejudice;**

- All claims against Dana White and Brock Lesnar are **dismissed with prejudice**;

- Defendants' motion to file excess pages **[ECF No. 126] is GRANTED** nunc pro tunc;

- Defendants' requests for judicial notice **[ECF Nos. 113, 116] are DENIED**;

- This case is REFERRED to a magistrate judge for a MANDATORY SETTLEMENT CONFERENCE. The parties' obligation to file their joint pretrial order is **STAYED until 10 days after that settlement conference.**

Dated: February 14, 2019

_____
U.S. District Judge Jennifer A. Dorsey