# **EXHIBIT 7**
# Deposition Transcript of Brian Stegeman (Excerpts)

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
MARK HUNT, an individual,      )
                               )
          Plaintiff,           )
                               )
     vs.                       ) CASE NO.
                               ) 2:17-cv-00085-JAD-VCF
                               )
ZUFFA, LLC d/b/a ULTIMATE      )
FIGHTING CHAMPIONSHIP, a       )
Nevada limited liability       )
company; BROCK LESNAR, an      )
individual; DANA WHITE, an     )
individual, and DOES I-50,     )
inclusive,                     )
                               )
          Defendants.          )
```

VIDEO DEPOSITION OF BRIAN STEGEMAN

Taken Remotely

Wednesday, November 23, 2022
9:05 a.m.

Reported by:  Angela Campagna, CCR #495

```
 1   APPEARANCES:

 2   For the Plaintiff:      CHRISTINA M. DENNING, ESQ.
                             Denning Moores, APC
 3                           12526 High Bluff Drive
                             Suite 300
 4                           San Diego, California 92130
                             Denningc@denningmoores.com
 5

 6   For the Defendants:     DAVID B. OLSEN, ESQ.
                             Henson & Efron PA
 7                           225 South 6th Street
                             Suite 1600
 8                           Minneapolis, MN  55402

 9
                             SAMUEL MIRKOVICH, ESQ.
10                           Campbell & Williams
                             710 South Seventh Street
11                           Suite A
                             Las Vegas, Nevada  89101
12

13   Also Present:           Ronald Cestari
                             Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

1  and, you know, shaking hands with everybody and
2  touring plants and showing your face, you know, at
3  various things.  And at the peak of it, I mean, we
4  probably had, I don't know, seven, eight fairly
5  high-level sponsors that we had obligations for.
6                      And I think part of that -- part
7  of that just is -- you know, the way this whole
8  circuit builds up, it's pretty crazy.  There's a lot
9  of people to keep happy, a lot of different bosses,
10 a lot of different -- you know, I mean, of course,
11 your main thing is you're training for fights and
12 you're, you know -- you know, you're dealing with --
13 you're dealing with UFC before all else, but you
14 have a lot of different stuff going on, you know.
15                      And I think he was just ready
16 after -- after two -- you know, after two bouts like
17 that, two bouts of illness that, you know -- for
18 anybody I think you would -- you would, you know,
19 feel your own mortality and say, I don't know if it
20 makes sense for me to be stepping into a locked
21 octagon.
22                      But, again, you'd have to -- you'd
23 really have to ask him all the reasons behind the
24 retirement, but my main thing is, you know, if he
25 wanted to have the opportunity to do pro wrestling,

1   well, the only way you can do that is to be retired
2   from the UFC contract.
3           Q.   I want to talk a little bit about the
4   year before the UFC 200, which was in 2016.
5                   So in 2015 was Brock contemplating
6   a return to the UFC?
7           A.   Well, two thousand -- okay.  So 2015 --
8   it's hard -- I don't want to -- we have -- our
9   agreements with WWE are confidential agreements, so
10  it's hard for me to -- I don't want to -- I don't
11  want to talk carte blanche about the WWE agreements
12  because I worry that, you know -- but I think it's
13  safe to say that 2015 was a contract year.
14          Q.   What does that mean?
15          A.   Whenever we had contract years -- if
16  you can kind of follow the media through this stuff
17  and -- you know, I mean, this may be a case where
18  the, you know, the peanut gallery has kind of gotten
19  it right, you know.  When there's a contract year,
20  you talk to everybody and see what's out there, you
21  know what I mean?  You try to figure out what's
22  the -- you know, what's the right thing to do.
23                  And -- and, honestly, at that time
24  I'm sure the competitor inside him is saying, I've
25  got a bad taste in my mouth about the way this went

```
 1   glove.  So they don't really make them.
 2          Q.   Has Brock ever been caught using
 3   steroids in the past?
 4          A.   Has -- no.
 5          Q.   Does the WWE have a wellness
 6   drug-testing policy?
 7          A.   Yes, they do.
 8          Q.   Was Brock ever tested as part of that?
 9          A.   I don't know.
10          Q.   Do you know whether Brock needed to get
11   permission from Vince McMahon to compete in UFC 200?
12          A.   Certainly.  We had an exclusive deal
13   with them, a multi-year deal, that -- where not
14   competing in combat sports and boxing was a
15   negotiated term.  So, yeah.  Yeah.
16          Q.   Did you personally speak with
17   Vince McMahon, seeking permission for Brock to
18   compete in UFC 200?
19          A.   No.
20          Q.   Do you know if Brock did that directly
21   with Vince?
22         MR. OLSEN:  I'm going to caution you there as
23   far as revealing any confidential communications
24   you've had.  They're attorney-client privilege.  So
25   if you can answer without revealing attorney-client
```

1   25 or 30, but I think they're going to go really
2   fast.
3                   So we'll start with this one.  You
4   should be looking at the Wednesday, June 1st, 2016,
5   e-mail from you to Tracy Long.
6           A.   Yep.
7           Q.   And this is a really easy one.
8                   Who is Tracy Long?
9           A.   Tracy Long, I'm not -- I believe she is
10  a paralegal and not a lawyer, but she's been in the
11  UFC legal department -- or was.  I don't know if she
12  still is.  But she had been there for a long time.
13          Q.   And there's nothing really riveting on
14  this e-mail chain.  It just looks like some
15  logistics, needing an address for Brock.
16                  Does this refresh your
17  recollection as to whether or not by this time there
18  had been agreement that Brock would participate in
19  UFC 200?
20          A.   I can tell you one thing about Brock.
21  There's never an agreement until -- until he signs
22  the paper.
23                  There was -- by June 1 we were at
24  least close enough that we were ready to start going
25  to paper, you know.  I think -- I think that -- I

```
 1   the language in the video game/merchandise stuff
 2   was -- I believe that was changed by the time we
 3   actually got there, but...
 4        Q.   There's a reference under "WWE Stuff"
 5   to three agreements.
 6                    What three agreements are you
 7   referring to there?
 8        A.   The promotional agreement, the letter
 9   agreement, and the bout agreement.
10        MS. DENNING:  All right.  I think we're on
11   Exhibit 6.
12                    (Exhibit 6 marked.)
13   BY MS. DENNING:
14        Q.   We'll mark as Exhibit 6 more e-mail --
15   another e-mail between you and Ms. Long, copied to
16   some other folks.  Give you a second to take a look
17   at this.
18        MR. OLSEN:  Ms. Denning, would you mind
19   stating the date of this e-mail, Exhibit 6, please?
20        MS. DENNING:  No problem.  It's June 3rd,
21   2016.
22        MR. OLSEN:  Thank you.
23   BY MS. DENNING:
24        Q.   Do you recognize this e-mail?
25        A.   I do.  I do.  I think there is -- I
```

1  think there is some e-mails between that -- between
2  that e-mail and the ones we were looking at before
3  that probably explain it a little bit better.
4                       But, yeah, I believe that would be
5  the -- what I think ultimately become the execution
6  copies of the agreements.  But I'm not -- I'm not
7  sure.  I'd need to see the whole chain to see if
8  maybe -- maybe I'm wrong.  Maybe I looked at those
9  or, you know, we looked at those together.  But if
10 it reflects the -- if it reflects everything for the
11 conversation with Lorenzo, then we're right on
12 point.  So...
13       Q.   Okay.  And I don't -- I don't want to
14 get into all the different iterations of the
15 agreements.  We're not going to go into that detail.
16 I just generally -- in this e-mail it states:
17 "Brian, pursuant to our conversation and your
18 conversation with Lorenzo."
19                       I just wanted to generally ask
20 you, how many times did you speak -- and we're
21 talking about Lorenzo Fertitta; correct?
22       A.   Yes.
23       Q.   How many times did you speak with him
24 prior to UFC 200?
25       A.   In the entire course of our

```
 1   relationship with UFC, or in connection with
 2   UFC 200?
 3         Q.   Let's go with in connection with
 4   UFC 200.  Thank you for that clarification.
 5         A.   Once.
 6         Q.   And was that the conversations that's
 7   referred to in this e-mail?
 8         A.   Yes.  That was the conversation that
 9   literally saved this and allowed it to happen.  So
10   probably the most critical conversation of the whole
11   thing.  So...
12         Q.   What was discussed during that
13   conversation?
14         A.   We had a -- we had -- we had an issue
15   that just wouldn't -- wouldn't resolve.  On our side
16   we were requesting that -- you know, we had a
17   long-standing -- a long-standing merchandise
18   agreement that basically would continue in
19   perpetuity, that could only be unilaterally on the
20   UFC side cut off at some point.  And we did not have
21   any kind of a permission right on it.
22                   And we had also given up -- if you
23   look at the 2009 agreement, I mean, they basically
24   had a right to do video games in perpetuity.  And, I
25   mean, even though they have been extraordinarily
```

1  good to us over the years.  You know, they always --
2  you know, they always try -- "always" isn't the
3  right word.  They tried to give you a heads-up on
4  these things as best they can.  You know, they have
5  historically offered consideration when it comes to,
6  like, the video game, even though technically they
7  don't have to.  They have the right just to use you
8  and go on.
9                      But they've always been good about
10 it.  You know, it's one of those things that makes
11 you uncomfortable, but also makes it uncomfortable
12 when you're doing business with other parties and
13 you're like, oh, and by the way, we can't give you
14 exclusive because there are these perpetual rights
15 that UFC has to do merchandise and video games
16 without our -- you know, without our permission.
17                     That's been a point that we had
18 argued about for a long time, like, you know, with
19 other companies.  And so --
20      MR. OLSEN:  I'm just going to caution you not
21 to reveal any legal strategies that you had and that
22 you discussed with Mr. Lesnar.  I think she's asking
23 you about your communications with Lorenzo Fertitta.
24      THE WITNESS:  Got it.
25      MR. OLSEN:  You can tell her what you

1  communicated to him.
2        THE WITNESS:  Yeah, so basically communicated
3  to him that we wanted to have at a minimum a right
4  to approve any and all merchandise or video games
5  that would use his name and likeness.  And,
6  additionally, I communicated to him that we wanted
7  the 2009 deal as opposed to being required to retire
8  to go back to, you know, WWE or continue with WWE or
9  have this deal.  We wanted to be done, cut off
10 completely.
11 BY MS. DENNING:
12       Q.    What was Lorenzo's role with the UFC in
13 this time frame?
14       A.    He was an owner.
15       Q.    What was Dana White's role?
16       A.    He was also an owner.  Dana was
17 probably much more involved with the day-to-day --
18 the day-to-day tasks and communicated with fighters
19 and making the fights.
20                   And I assume Lorenzo was primarily
21 involved on the business side, although when -- when
22 things had gotten -- when things went to a point
23 where it was difficult to build a bridge, Lorenzo
24 was, I think, a good bridge builder.  I think he --
25 you know, he was -- he was able to help get over

1  tough issues.
2        Q.   Had you been negotiating the
3  merchandising aspect of the deal with someone else
4  prior to your conversation with Lorenzo?
5        A.   I had spoken to Dana about it, I
6  believe.
7        Q.   And you couldn't -- is it fair that you
8  couldn't get it resolved with Dana, so that's why
9  you then spoke with Lorenzo?
10       A.   Yes.
11       MS. DENNING:  We've been going for quite
12 sometime.  Do you want to take a ten-minute break
13 and we'll reconvene?
14       MR. OLSEN:  That's fine.
15       MS. DENNING: With everybody?  Okay.  Let's go
16 off the record.
17       THE VIDEOGRAPHER:  We are now going off the
18 record.  The time is 10:16 a.m.
19                (Short break.)
20       THE VIDEOGRAPHER:  We are now going back on
21 the record.  The time is 10:29 a.m.
22       MS. DENNING:  Let's mark as Exhibit 7.
23 BY MS. DENNING:
24       Q.   This appears to be some text messages
25 between you and someone named Greg Hendrick, who I

1                    The only thing that -- only thing
2    that Brock is allowed to do is professional
3    wrestling when he's retired.  And so part of what we
4    were talking about with Lorenzo, I mean, a big part
5    of it was the merge.  A big part of it was the video
6    games.  But the biggest thing was the fact that this
7    thing continues to prohibit us from doing other
8    mixed martial arts.
9                    Does that make sense?  And if you
10   look at the agreements and you look at the way they
11   played out, we ended up batting two out of three on
12   that.  We didn't get the big one.
13        Q.   I think this is going to be Exhibit 11.
14   This is a --
15        MR. OLSEN:  This should be Exhibit 12, I
16   believe.
17        MS. DENNING:  Oh.  Thank you.
18                (Exhibit 12 marked.)
19   BY MS. DENNING:
20        Q.   Exhibit 12 is a June 8, 2016, e-mail to
21   you from USADA.
22        A.   Yep.
23        Q.   Were you the point of contact for Brock
24   as it related to communications from USADA?
25        A.   Everything, for the most part,

1  involving technology I would probably be the point
2  of contact with this sort of thing, yeah.  Brock's
3  not -- Brock's not particularly technologically
4  savvy, you know.
5          Q.   So when a random test would get
6  scheduled, would that -- would the first stop be
7  through you?
8          A.   Well, if you mean when somebody -- when
9  somebody shows up and they're at the door -- nothing
10 gets scheduled.  You know, like a random test isn't
11 scheduled or it wouldn't be random.  But when
12 they -- hypothetically, you fill out your
13 whereabouts, you say where you're going to be, when
14 you're going to be there.  You have to fill it out
15 all the way through.  And then somebody shows up at
16 the door, they wait a period of time before they
17 call a phone number, and you have -- if you're
18 smart, you put, like, as many phone numbers as you
19 can so that you ensure that you're aware of what the
20 heck is going on.
21                  And I'm sure I probably would have
22 been the primary on the phone number that gets
23 called when that happens because I always have my
24 phone on me.
25          Q.   Okay.  Thank you.

1                    Okay.  Okay.  Okay.  Scroll back
2    up for a second.  I just want to read that.
3                    Scroll back up one more to 1.1.
4    Okay.  Scroll down.
5                    Can you stop.
6         Q.   Sure.
7         A.   Okay.  It's just the date down at the
8    bottom.  I think the rest of it's pretty much just
9    the lawyer stuff.
10                   Yeah, this would have been --
11   yeah, that's dated the 15th of December.  Those
12   e-mails are from -- those e-mails are from
13   September.  So they're completely disconnect here.
14        Q.   This is what the ultimate resolution
15   was; correct?
16        A.   That's what the ultimate resolution
17   was, yes.
18        Q.   Okay.  Is this an agreement that was
19   negotiated between Brock's team and the commission?
20        A.   I believe Howard -- I believe Howard
21   was -- was handling that.  And it's something that
22   would have been discussed back and forth.  Yes, I
23   mean, it's like any agreement.
24        Q.   Were you asked to participate in
25   weighing in on any of these terms of the agreement?

1      A.   I was very clear that we were not
2   making any admission, because there's absolutely no
3   way that we were going to -- we were not going to
4   make -- the only admission that we were --
5        MR. OLSEN:  Just let me caution you again, any
6   communications you had with Howard Jacobs would be
7   subject to an attorney-client privilege.  So if you
8   can answer it without revealing any attorney-client
9   privileged information, go ahead and answer.
10  BY MS. DENNING:
11       Q.   Okay.  I'll just ask one more question
12  on this.
13                  There's a -- on page 3, line 3 and
14  4, it says:  "Whereas, Lesnar admits that his
15  June 28, 2016, and July 9, 2016, positive tests
16  brought disrepute to unarmed combat."
17                  I'm asking if that was something
18  that was a negotiated term of this agreement.  If
19  you know.
20       A.   I don't -- I don't know that line
21  specifically, but it's true.  I mean, any -- any
22  positive test that occurs in a context of a sport
23  brings disrepute on that sport.
24       MS. DENNING:  Can we take a ten-minute break
25  again?  I think I'm down to probably about four more

```
 1                    REPORTER'S CERTIFICATE

 2

 3    STATE OF NEVADA   )
                        )  ss.
 4    COUNTY OF CLARK   )

 5
                I, Angela Campagna, a certified court
 6    reporter in Clark County, State of Nevada, do hereby
      certify:
 7                      That I reported the taking of the
      video deposition of the witness, BRIAN STEGEMAN,
 8    taken remotely on Wednesday, November 23, 2022,
      commencing at the hour of 9:05 a.m.
 9                      That prior to being examined, the
      witness was by me first duly sworn to testify to the
10    truth, the whole truth, and nothing but the truth.
                        That I thereafter transcribed my
11    said shorthand notes into typewriting and that the
      typewritten transcript of said deposition is a
12    complete, true, and accurate transcription of
      shorthand notes taken down at said time.
13                      I further certify that I am not a
      relative or employee of an attorney or counsel of
14    any of the parties, nor a relative or employee of
      any attorney or counsel involved in said action, nor
15    a person financially interested in said action.
                        IN WITNESS WHEREOF, I have
16    hereunto set my hand in my office in the County of
      Clark, State of Nevada, this 7th day of December
17    2022.

18

19                      _____
                        ANGELA CAMPAGNA, CCR #495
20

21

22

23

24

25
```