PETER S. CHRISTIANSEN, ESQ.
Nevada Bar No. 5254
pete@christiansenlaw.com
KENDELEE L. WORKS, ESQ.
Nevada Bar No. 9611
kworks@christiansenlaw.com
CHRISTIANSEN LAW OFFICES
810 S. Casino Center Boulevard, Ste. 104
Las Vegas, Nevada 89101
Telephone: (702) 240-7979
Facsimile: (866) 7412-6992
HOWARD L. JACOBS, ESQ.
howard.jacobs@athleteslawyer.com
Law Offices of Howard L. Jacobs
2815 Townsgate Road, Suite 200
Westlake Village, California 91361
Telephone: (805) 418-9892
Facsimile: (805) 418-9899
-and-
DAVID BRADLEY OLSEN, ESQ.
Bar No. MN197944
dolsen@hensonefron.com
HENSON EFRON, P.A.
225 South 6th Street, Suite 1600
Minneapolis, MN 55402
Telephone: (612) 339-2500
Facsimile: (612) 339-6364

Attorneys for Separate Defendant BROCK LESNAR

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Mark Hunt,

               Plaintiff,

   vs.

Zuffa, LLC, d/b/a ULTIMATE FIGHTING
CHAMPIONSHIP, *et al*.,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:17-cv-00085-JAD-VCF

**SEPARATE DEFENDANT BROCK
LESNAR'S REPLY MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY
JUDGMENT (ECF NO. 220)**

1

## TABLE OF CONTENTS

2   PRELIMINARY STATEMENT ................................................................................ - 1 -

3   THERE ARE NO GENUINE ISSUES OF FACT IN DISPUTE .............................. - 1 -

4      A.    HUNT DOES NOT DISPUTE LESNAR'S FACTUAL STATEMENT. ...................... - 1 -

5      B.    HUNT'S "STATEMENT OF DISPUTED FACTS" DOES NOT CREATE A
         MATERIAL FACT ISSUE. ........................................................................ - 7 -

6

7         1.   Background Details that are Not Disputed. ........................................ - 7 -

      2.   "Facts" With No Record Support. ...................................................... - 7 -

8

9   ARGUMENT AND AUTHORITY ........................................................................... - 10 -

10     A.    LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S THIRD CAUSE
         OF ACTION FOR COMMON LAW FRAUD. ........................................... - 10 -

11

12     B.    LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S EIGHTH  CAUSE
         OF ACTION FOR COMMON LAW BATTERY. ...................................... - 13 -

13        1.   Hunt's Battery Claim is Barred by his Unequivocal Consent. ........................... - 13 -

14        2.   Hunt's Battery Claim is Barred by His Express and Primary Assumption of the Risk.
            ................................................................................................. - 16 -

15

16        (a)   Hunt Expressly Assumed the Risk.................................................... - 16 -

17        (b)   Hunt is Deemed to Have Primarily Assumed the Risk...................................... - 17 -

18     C.    LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S FOURTH AND
         TENTH CAUSES OF ACTION FOR CIVIL AIDING AND ABETTING AND

19           CONSPIRACY. .................................................................................... - 19 -

20  CONCLUSION .................................................................................................... - 19 -

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

Hunt's opposition memorandum (Doc. 242) confirms that there are no genuine issues of material fact in dispute and demonstrates that he is still relying solely on unfounded allegations, outright fabrications, and pure conjecture in his quest to prove that he was the victim of fraud and battery. Because Hunt cannot meet his burden of proof on any element of his remaining claims, Lesnar is entitled to summary judgment in his favor.

**THERE ARE NO GENUINE ISSUES OF FACT IN DISPUTE**

**A.      HUNT DOES NOT DISPUTE LESNAR'S FACTUAL STATEMENT.[1]**

To conclude that there are no *material* facts in dispute the Court need only compare the record facts stated in Lesnar's opening Memorandum (Doc. 220) with Hunt's response to each (Doc. 242), if any. The list looks like this:[2]

1.      Hunt fought "doping" UFC fighter Antonio "Bigfoot" Silva on December 6, 2013. (**Admitted. Hunt Memo at 4**)

2.      Hunt fought "doping" UFC fighter Frank Mir on March 20, 2016. (**Admitted. Hunt Memo at 4**)

3.      Two days after Hunt fought the "doping" Frank Mir, Hunt's agent contacted UFC to advise that Hunt would like to "hopefully" fight at the upcoming UFC 200. (**No Response**)

4.      In 2015 and 2016 Hunt knew that UFC fighters were "failing tests for performance-enhancing drugs," and that "there [were] issues with performance-enhancing substances in the UFC." (**No Response**)

5.      On April 12, 2016, Hunt entered into a new Promotional and Ancillary Rights Agreement ("PARA") with UFC which "supersedes any and all prior contemporaneous written or oral agreements or representations between the parties." (**Admitted. Hunt Memo at 5**)

6.      PARA Section 14.1 includes a broad assumption of risk and waiver which provides in part that "Fighter . . . does hereby clearly, unambiguously and explicitly accept, all risks, foreseen and unforeseen, associated with preparing for and participating in the sport and the Bouts." (**Admitted. Hunt Memo at 5**)

---

[1] Hunt's "Factual Statement" at fn. 5, 6, 27, 32, 34, 35, and 70 includes numerous citations to various articles published on the Internet, none of which are supported by the declaration, admission, or testimony of any witness, and all of which are off-record hearsay and should be disregarded. *See* Fed. R. Civ. P. 56(c)(1)(A) and (B).

[2] Lesnar's opening memorandum (Doc. 220) includes record citations for each stated fact.

7. On May 15, 2016, White contacted Hunt "about possibly participating in UFC 200," and on June 4, 2016, Hunt "learned that UFC had publicly announced Lesnar's return from his UFC retirement" and that Lesnar was his "potential opponent for a fight at UFC 200." (**Admitted. Hunt Memo at 6, 8**)

8. On June 4, 2016, Hunt texted White, *"[c]an you make sure [Lesnar] gets test [sic] properly. Doesn't matter*," by which Hunt intended to communicate his desire that Lesnar be made subject to the UFC Anti-Doping Program ("UFC ADP") and "receive proper UFC ADP testing by [the United States Anti-Doping Agency] USADA." **(No Response)**

9. On June 6, 2016, Hunt communicated to White and UFC that he "would agree to fight Lesnar at UFC 200," and he signed a UFC 200 Bout Agreement ("Bout Agreement"). (**Admitted. Hunt Memo at 8**)

10. The Bout Agreement provides in part that it, along with the PARA, "sets forth the entire agreement and understanding between [UFC] and [Hunt] . . . and supersedes any prior or contemporaneous agreements with respect to the subject matter." **(No Response)**

11. Section 12(a) of the Bout Agreement includes a broad consent and waiver identical to that in the PARA. **(No Response)**

12. Lesnar executed the Bout Agreement on June 3, 2016, and UFC countersigned on June 6, 2016. **(No Response)**

13. Hunt uses the term "clean fighter" to describe a fighter who does not use performance enhancing substances that are prohibited by the UFC ADP. **(No Response)**

14. Hunt never demanded, and UFC never agreed to amend either the PARA or Bout Agreement to make Hunt's consent to participate in UFC 200 conditional on Lesnar being a "clean fighter," or to provide for the payment of any additional compensation to Hunt if Lesnar should test positive for the presence of prohibited substances. **(No Response)**

15. The PARA, the Bout Agreement, and the Standard Fighter Contract required by the Nevada Athletic Commission ("NAC") are "the only written agreements that governed the terms and conditions of [Hunts'] participation at UFC 200." **(No Response)**

16. None of those three agreements say "anything about Brock Lesnar having to be a clean fighter," and neither UFC nor White made any such promise. **(No Response)**

17. Lesnar retired from the UFC on December 30, 2011. (**Admitted. Hunt Memo at 6**)

18. Three and one-half years later, on June 3, 2015, UFC adopted the ADP. **(No Response)**

19. The UFC ADP applies to fighters who are under contract with the UFC. **(No Response)**

20. All UFC fighters become part of the registered testing pool immediately upon entering into a contractual relationship with UFC and are subject to USADA drug testing at that time. But if an athlete is not under contractual agreement with the UFC, then there is no legal way for them to be tested. **(No Response)**

21. Lesnar was "registered by USADA into the UFC ADP testing pool on or about June 6, 2016," which is the same day his most recent contract with UFC was finalized. (**Admitted. Hunt Memo at 7, 10**)

22. Jeff Novitzky, UFC's Vice President of Athlete Health and Performance, explained that in 2016 Lesnar was treated as a new athlete coming into the UFC and was not made subject to the 4-month UFC ADP testing rule because his 2011 retirement was before UFC had an anti-doping program and it was not an attempt to evade any then-existing testing requirements. (**No Response**)

23. Prior to UFC 200 Hunt knew that Lesnar had been granted an exemption from the UFC ADP four-month testing rule. (**Admitted. Hunt Memo at 9**)

24. White did not have anything to do with Lesnar having been granted an exemption from the UFC ADP's four-month testing requirement. (**No Response**)

25. Although people were telling Hunt that Lesnar was "doping," Hunt agreed to fight him anyway. (**Admitted. Hunt Memo at 9**)

26. When Hunt communicated with White via text message, and when he gave pre- and post-fight interviews, he always tried to be honest with his statements and to not say anything that was untrue. (**No Response**)

27. One of Hunt's first reactions after learning of Lesnar's four-month exemption was to text White to make sure that Lesnar is getting tested. (**No Response**)

28. On June 7, 2016—the day after he executed the Bout Agreement—Hunt "expressed [his] concern to White that Lesnar was 'juicing,'" by which Hunt meant that he was "concern[ed] that Lesnar was using substances prohibited by the UFC ADP" and was "doping." (**Admits executing Bout Agreement. Hunt Memo at 8. No Response to Remainder**)

29. On June 7, 2016, Hunt sent a text message to White which read, "*Dana if he test positive for juicing send me his ppv numbers* [5 laughing/crying emojis] *ok deal thanks in advance* [4 winking emojis]," by which Hunt was referring to the possibility that Lesnar may test positive for a substance prohibited by the UFC ADP. (**Admitted. Hunt Memo at 9-10**)

30. On June 8, 2016—only two days after signing his Bout Agreement—Lesnar provided a urine sample to USADA for testing. (**No Response**)

31. On June 28, 2016, Lesnar's June 8 test results came back negative. (**No Response**)

32. On June 8, 2016, Hunt sent a text to White which read, "*how about if he is positive for cheating* [4 grinning emojis]…*Hey Dana wats this waiver that Lesnar is getting from usada wats the deal….On a serious not* [sic] *why is he exempt from testing for 4 months wen* [sic] *everyone has to*," by which Hunt was again referring to the possibility that Lesnar may test positive for substances prohibited by the UFC ADP. (**No Response**)

33. Hunt did not intend his text to be construed as an offer to amend the PARA or Bout Agreement to provide for additional compensation to Hunt should Lesnar test positive, but

he did intend to express his concern about "Lesnar's attempt to cheat and evade detection." **(No Response)**

34.   On June 8, 2016, Hunt participated in a recorded interview for *MMA Weekly.com* during which he said that he had just "fought two [UFC] doping fighters in a row, " and that "I've been fighting cheaters my whole career," by which he intended to mean that he has fought several individuals who had been using substances prohibited by the UFC ADP. **(No Response)**

35.   On June 9, 2016, Hunt participated a recorded interview for FOX UFC during which he declared that although he thought Lesnar was "juiced to the gills" he "still [thought he was] gonna knock him out." **(No Response)**

36.   "Juiced" is a term Hunt uses to describe a fighter who is using performance enhancing substances that are prohibited by the UFC ADP, and "juiced to the gills" is a phrase he uses to describe a fighter using prohibited substances in quantities sufficient to positively affect athletic performance. **(No Response)**

37.   During a June 9, 2016 interview with FOX UFC, Hunt said with regard to his suspicions of Lesnar's "juicing" that:

- "they were never going to stop me from taking the [UFC 200] fight"

- "I'm always going to fight anyway, it doesn't matter"

- "I love competition but I just don't think its fair. I mean, I don't think its an even playing field…But it doesn't mean You're not going to get knocked out. Frank Mir was juicing and he got knocked out…The same thing's going to happen with Brock Lesnar"

- "Shucks. I don't give a rats what You take. I'll knock Your face off, that's what I'll do. I'll teach You for taking that s*** anyway"

**(No Response)**

38.   On June 8 and 9, 2016, Hunt sent text messages to White which read, "*we know he has no problem with testing cause he is exempt for 4 months everything will be out of his system* [5 frowning emojis]," which referred to Lesnar's possible use of substances prohibited by the UFC ADP. **(Admitted. Hunt Memo at 9-10)**

39.   When White texted back that "[USADA is] ALL OVER HIM," Hunt responded with a text saying, "*no problems*." **(Admitted. Hunt Memo at 9-10)**

40.   On June 15 and 16, 2016, Lesnar provided additional blood and urine samples to USADA for testing. **(No Response)**

41.   On July 1, 2016—a week before the scheduled fight—Lesnar's June 15 and 16 test sample results came back negative. **(No Response)**

42.   On June 28, 2016, Lesnar was asked to provide another urine sample to USADA for testing. **(No Response)**

43.   On July 6, 2022—three days before the scheduled fight—Hunt learned that UFC Fighter Jon Jones was reported to have had tested positive for a substance prohibited by the UFC ADP and would therefore not be permitted to participate in UFC 200. **(No Response)**

44.   Hunt's scheduled UFC 200 fight with Lesnar was "promoted to UFC main event" to replace the *Jon Jones vs Daniel Cormier* fight that had been canceled. **(No Response)**

45.   After Hunt learned about Jones' positive test, he "still agreed to show up and fight Brock Lesnar." **(No Response)**

46.   On July 9, 2016—the day of the fight—Lesnar provided a urine sample to USADA for testing. **(No Response)**

47.   Lesnar was tested on six separate days, nine urine and blood tests in total, before UFC 200—and all test results returned before the fight were negative. **(No Response)**

48.   Prior to UFC 200 Lesnar never represented to Hunt that he was a "clean fighter," or that he would not test positive for a substance prohibited by the UFC ADP. **(No Response)**

49.   Hunt and Lesnar did not communicate with each other in any manner prior to UFC 200. **(No Response)**

50.   Lesnar did not make any other representations to any third parties on which Hunt relied in connection with his decision to participate at UFC 200. **(No Response)**

51.   White never told Hunt that Lesnar was going to be "clean," but rather only that Lesnar would be tested by USADA—which he was. **(No Response)**

52.   Hunt is not claiming that UFC or USADA tested Lesnar in an improper way. **(No Response)**

53.   Hunt bases his "cheating" claim only on a "gut feeling" that White or UFC knew prior to UFC 200 that Lesnar was taking banned substances. **(No Response)**

54.   Hunt's philosophy has always been that he will "fight anyone at any time . . . if the price is right." **(No Response)**

55.   Consistent with that philosophy, he has signed numerous contracts as a professional fighter which have language in them that says, "I assume the risk and I know that by going to fight, I might be hit, punched, kicked, submitted, knocked out, or I could even die." **(No Response)**

56.   Hunt "knew those risks" and he was always "willing to go forward and fight anyways." **(No Response)**

57.   Hunt knew prior to UFC 200 that Lesnar would try to knock him out and to inflict pain and injury on him sufficient to cause him to concede defeat. **(No Response)**

58. Hunt knew that the nature and extent of the physical injuries that may result from his participation in the UFC 200 Bout included severe and permanent injury and even death, which are risks inherent in the sport of MMA. **(No Response)**

59. Hunt was acutely aware of the potential for injury because, in separate fights that took place in 2008, 2013, 2014, and 2015 (as well as March 4, 2017), he was either knocked out by his opponent or was ruled to have been technically knocked out. **(No Response)**

60. Hunt knew that "whether somebody is cheating or not, there's a risk of severe injury when you step into the octagon," and "accepted those risks." **(No Response)**

61. Despite his suspicions that Lesnar was "juiced to the gills," at no time prior to UFC 200 did Hunt intend to withdraw from the fight, communicate to White or UFC that he intended to withdraw from UFC 200, or actually withdraw from the fight. **(No Response)**

62. Hunt fought Lesnar at UFC 200 and lost to him in a 3-round unanimous judge's decision. **(Admitted. Hunt Memo at 11)**

63. Hunt was paid $700,000 for the fight, which was all of the compensation to which he was contractually entitled pursuant to the PARA and Bout Agreement—none of which pay was dependent on whether he won or lost. **(No Response)**

64. Hunt was not physically injured in his fight with Lesnar at UFC 200. **(No Response)**

65. On July 10, 2016—the day after UFC 200—Hunt participated in a recorded interview for SB Nation Submission Radio during which he said that he lost to Lesnar at UFC 200 because, "*I just got caught, I couldn't get out of first gear—he was the bigger man and he caught me.*" **(No Response)**

66. On July 12, 2016, Hunt texted White to say, "*thank u guys so much for looking after me a* [sic] *hooking me up with the Brock fight regaurdless* [sic] *the result mate I'm happy Brock is such a famous person he has made me more famous.*" **(No Response)**

67. On July 15, 2016, USADA reported that Lesnar's June 28, 2016, pre-fight test results had come back positive for the presence of a prohibited substance **(Admitted. Hunt Memo at 11)**, and on July 19, 2016, USADA reported that Lesnar's July 9, 2016, pre-fight test results had come back positive. **(No Response)**

68. The adverse analytical findings were reported to be for Clomiphene and its metabolite, 4-hyrdoxyclomiphene—which are not steroids. **(Admitted. Hunt Memo at 11)**

69. Hunt has no evidence that Lesnar, UFC, or White (i) had any knowledge of Lesnar's UFC ADP positive test results prior to the UFC 200 Bout, (ii) in any way manipulated Lesnar's UFC 200 ADP test results, (iii) induced, persuaded, or influenced USADA to delay reporting of Lesnar's UFC ADP test results until after the UFC 200 Bout, or (iv) delayed or concealed the public reporting of Lesnar's UFC 200 UFC ADP test results. **(No Response)**

70. After UFC 200, and in accordance with his 2016 PARA, Hunt finished out his contract by fighting five more times in the UFC and, in his own words, made "awesome money" and "got everything [he] wanted." **(No Response)**

71.   Hunt did not forego any post-UFC 200 fight opportunities as the result of physical injuries he sustained at UFC 200, and he cannot point to any fight or paid appearance that got canceled because he fought Lesnar. **(No Response)**

72.   Hunt has no idea how much money he hopes to receive as the result of this lawsuit, and he does not have any damages figure or computation to determine his claimed damages. **(No Response)**

**B.   HUNT'S "STATEMENT OF DISPUTED FACTS" DOES NOT CREATE A MATERIAL FACT ISSUE.**

   **1.   Background Details that are Not Disputed.**

   Many of the background details Hunt recites are not in dispute, such as Hunt's professional fighting resume' or dream of becoming a champion, his 2013 and 2016 bouts with "doping" UFC fighters, the 2016 PARA he signed, his text messages with White, Lesnar's status as a professional wrestler, Lesnar's 2011 retirement from the UFC, Lesnar's communications with White about a possible return to the UFC, Lesnar's need to get approval from WWE's Vince McMahon to fight in the UFC, Lesnar's signature on and the terms of his June 3, 2016, UFC Bout Agreement, the terms of the UFC ADP, White's representation to Hunt that Lesnar would be tested, and Hunt's agreement to fight Lesnar despite his suspicions and complaints that Lesnar was "doping."[3]

   **2.   "Facts" With No Record Support.**

   Numerous other "facts," however, have no record support, the first of which is Hunt's claim that White "falsely" represented to him during the months after the April 2016 PARA was signed that "[Hunt's] opponent was not known."[4] But there is nothing false about the claimed representation because there is no dispute that White was in fact considering several opponents for Hunt, one of whom was Lesnar, or that Lesnar was not certain he would actually fight until he first obtained permission from WWE (to which he was under exclusive contract), determined for himself that he was fit enough, agreed to terms with UFC, and then signed an Amendment to his PARA and a new Bout Agreement—none of which were determined or finalized until June 6, 2016.[5] Until that date, Hunt's UFC 200 opponent was not known or confirmed.

---

[3] Hunt Memo at 4-10.

[4] *Id.* at 6.

[5] Olsen 2nd Decl. **EX O**, White Tr. 21:12-23:9, 39:2-41:1, 45:10-47:17, 50:4-50:13, and 73:15-74:2; **EX P**, Lesnar Tr. 28:6-30:4; Section A, *supra*, at Nos. 7-12.

1    In a similarly misleading argument disguised as "fact" Hunt proclaims that, "[t]here is no

2  reason why Lesnar could not have submitted to drug testing in April, knowing that he would fight in

3  UFC 200," and that UFC and White "should have every reason to *demand* that Lesnar submit to

4  drug testing as soon as possible."[6] But it is undisputed that UFC has the authority to require testing

5  only of athletes who are currently under contract, and that Lesnar was not under contract to the UFC

6  until June 6, 2016—at which time he was immediately subject to the UFC ADP and tested.[7]

7    Hunt next tries to rewrite history by claiming, for the first time, that "he would have been

8  significantly more suspicious about Lesnar's potential PED use had he known" Lesnar was training

9  in March 2016.[8] But there is no dispute that Hunt was already suspicious of Lesnar prior to their

10  fight because he told anyone and everyone who would listen that he thought Lesnar was "juiced to

11  the gills" and defiantly proclaimed that it "doesn't matter" and that he would fight him anyway.[9] In

12  light of those facts, Hunt's latest declaration that he was "deathly afraid of being pitted against

13  another doping fighter with an unfair advantage and superhuman strength"[10] is not only an obvious

14  recent fabrication, it is entirely immaterial.

15    Another recently manufactured claim is that Hunt agreed to participate at UFC 200 only

16  because he believed that UFC and White would take reasonable, non-evasive steps to ensure that

17  Lesnar would either be a clean fighter or would adequately be tested and disqualified prior to the

18  bout if he was not clean.[11] But Hunt testified in his deposition that he had no communications with

19  White other than the text messages that appear in deposition Exhibit 12—none of which evidence

20  any of the representations claimed and instead include only White's confirmation that Lesnar would

21

22

23

---

24  [6] Hunt Memo at 7. *See also Fed. Trade Comm'n v. OMICS Grp. Inc*., 374 F. Supp. 3d 994, 1002 (D.

25  Nev. 2019), *aff'd*, 827 F. App'x 653 (9th Cir. 2020) ( "arguments of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary

26  judgment.").
  [7] Section A, *supra* at Nos. 20-22.

27  [8] Hunt Memo at 7.
  [9] Section A, *supra* at Nos. 35-39.

28  [10] Hunt Memo at 9.
  [11] *Id*. at 10.

1   be tested (which he was).[12] Hunt also testified that he has for years been on a crusade to get the

2   "Hunt clause" inserted into professional fighting contracts, pursuant to which a "doping" fighter

3   would have to forfeit his purse to his opponent, but that he was never successful in doing so and

4   fought Lesnar knowing it was not part of his deal.[13]

5         Because he cannot avoid the facts, Hunt tries to muddy the water by characterizing all of his

6   admitted statements about Lesnar "juicing" as just "smack talk" that he was using to hype a fight.[14]

7   But that characterization does not explain all of his *private* messages to White that no fan was ever

8   expected to see. Those messages, which are undisputed, create a complete record of the private

9   conversations between Hunt and White, including Hunt's stated suspicions about Lesnar's "doping"

10  and White's confirmation that Lesnar would be tested—which he was. They do not include any

11  "smack talk" intended for publicity, and they do not include any representations or promises by

12  White that Lesnar "would be cleared of any PED use prior to UFC 200."[15]

13        Hunt also tries to manufacture a fact issue where non exists by arguing for the first time that

14  he relied on  Lesnar's signature on a Bout Agreement to form a belief that he would be a "clean, fair

15  fighter at UFC 200," and that he "assumed Lesnar was following the Anti-Doping Policy and

16  testing regulations like everyone else, given that that all UFC fighters are subject to the same bout

17  agreement provisions."[16] But Hunt previously admitted that he never relied on *any* agreement

18  Lesnar signed.[17] And Hunt also admittedly knew that despite the existence of the UFC ADP and

19  any agreements UFC fighters are required to sign that it was not uncommon for them test positive

20  because, among other things (i) he has been facing "cheaters" his entire career, (ii) he had just

21

22

---

23  [12] Olsen Decl., **EX A**, Hunt Tr. at 221:16-224:13; Section A, *supra*, at Nos. 26-39. *See also Lee v.*
    *Venetian Resort Casino, LLC*, No. 2:17-cv-00603-APG-VCF, 2017 WL 5985937, at *2 (D. Nev.
24  Dec. 1, 2017) (a party cannot create a disputed fact by contradicting his prior deposition testimony).
    [13] Hunt SJ Ex. 1 at Tr. 18 ("I asked for a clause in the contract before—seven years ago, I think it
25  was. Just if I fought a guy that was on steroids, to not give him any finance."). *See also* Olsen Decl.
    **EX A**, Hunt Tr. at 231:16-233:7.
26  [14] Hunt Memo at 10-11.
    [15] Section A, *supra*, at Nos. 8, 26-29, 32, 38-39, 51, and 53.
27  [16] Hunt Memo at 11-12.
    [17] Olsen Decl. **EX C**, HR LRFA Nos. 118-120 (admitting that Lesnar did not make any oral or
28  written representations to Hunt); Nos. 121-123 (admitting that Lesnar never represented to Hunt
    that he was a "clean" fighter or would not test positive).

1  fought the "doping" Silva and Mir, both of whom signed similar bout agreements and then tested

2  positive for banned substances, and (iii) his fight with Lesnar was promoted to the main event only

3  because Jon Jones—who also signed a bout agreement and was subject to the ADP—tested

4  positive.[18]

5       Having no facts to support his claims, Hunt concludes by asking this Court to accept as fact

6  that he "trusted White and UFC to look after him."[19] But to see that claim for what is its—a recent

7  fabrication with no record support—the Court need only consider the undisputed facts that Hunt had

8  his own lawyer,[20] admittedly signed two integrated agreements negotiated at arms-length which set

9  forth all of the terms and conditions of his relationship with the UFC and which specifically

10  disclaim the existence of or reliance on any other promises, inducements, or agreements,[21] admitted

11  that his only communications with White were via the text messages that are of record,[22] and

12  testified that he had no other oral or written agreements with White or UFC.[23]

13  ## ARGUMENT AND AUTHORITY

14  **A.  LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S THIRD CAUSE OF ACTION FOR COMMON LAW FRAUD.**

15       The Ninth Circuit reaffirmed in this case that a false representation of material fact made by

16  the defendant is an essential element of any fraud claim, *Hunt v. Zuffa, LLC*, No. 19-17529, 2021

17  WL 4355728 at *2, n.3 (9th Cir. Sept. 24, 2021), and Hunt does not dispute either that any claimed

18  reliance on the false representation must be justifiable or that fraud must be proved by clear and

19  convincing evidence. *Tai-Si Kim v. Kearney*, 838 F. Supp. 2d 1077, 1097 (D. Nev. 2012); *Bulbman,*

---

[18] Section A, *supra*, at Nos. 1-3, 34, and 43-45.
[19] Hunt Memo at 12.
[20] Olsen Decl., **EX A**, Hunt Tr. 214:21-216:8.
[21] Section A, *supra*, at Nos. 5-6, 9-11.
[22] Olsen Decl., **EX A**, Hunt Tr. 118-1-118:12, 223:2-224:13, and 259:2-259:22.
[23] *Id.*, **EX A**, Hunt Tr. 220:23-221:25. The remainder of Hunt's "factual statement" is devoted to arguing that Lesnar somehow gained an unfair competitive advantage because he tested positive for the presence of a prohibited substance, and that Hunt was damaged as a result. Because Hunt cannot meet his burden of proof on any other element of his claims it is not necessary for the Court to consider whether he was damaged. Should the Court choose to address the issue, Lesnar relies on the arguments in UFC's and White's Motion for Summary Judgment (Doc. 219), in which he joined (Doc. 234), UFC's Motions to Exclude Brian Buss (Doc. 233) and Carrie Hastings (Doc. 231), and UFC's Reply Memoranda in Support of Motions for Summary Judgment and to Exclude Witnesses.

*Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992); *Chen v. Nev. State Gaming Control Bd.*, 994 P.2d 1151, 1152 (Nev. 2000). He has plainly not met and cannot meet his heightened burden.

In a tacit admission that he cannot identify any false representation on which he could justifiably have relied, Hunt claims now for the very first time that he was fraudulently induced to participate in UFC 200 by Lesnar's signature on a Bout Agreement which includes a provision that requires competitors to abide by the UFC ADP. For several reasons, his new argument does not create a genuine issue of fact and does not defeat Lesnar's summary judgment motion.

First, Hunt specifically claimed in his Supplemental Complaint to have relied on an entirely different document—a pre-fight questionnaire which he later admitted having never seen.[24] He is bound here by that claim. *E.g., Arik v. Meyers*, No. 2:19-cv-01908-JAD-NJK, 2020 WL 515843, at *2 (D. Nev. Jan. 31, 2020) (affirming that allegations in a complaint are considered judicial admissions). But even if Hunt were not bound by his prior admission, he offers no evidence that he ever saw or read Lesnar's Bout Agreement—which means he could not have relied on it, and he has previously admitted in response to Rule 34 requests that Lesnar never made *any* representations to *any* third parties on which he relied in connection with his decision to participate in UFC 200.[25]

Second, even if Hunt had seen or read UFC's standard Bout Agreements, he misconstrues what they require of competitors. The provision quoted lists three things fighters must do: (i) "comply with and be bound by all aspects of the [UFC ADP]," (ii) provide samples for analysis by approved laboratories, and (iii) in the event of an ADP violation, submit to the authority and jurisdiction of the UFC ADP arbitration process.[26] So, as opposed to Hunt's claim that "by signing his bout agreement . . . Lesnar was representing to the world that he would enter the ring as a clean, non-doping fighter,"[27] Lesnar was instead representing to UFC only that he would comply with and submit to the ADP testing process (which he did), and that if a violation occurred (which happened)

---

[24] *Compare* Doc. 109, Supp. Compl. at ¶ 84 (Hunt's original claim that he relied on a pre-fight questionnaire Lesnar filled out) with Olsen Decl. **EX C**, HR LRFA 119-120 (Hunt admitting that he never saw or read the questionnaire), and Hunt Memo at 7-8, 23-24 (Hunt's recently fabricated claim that he relied on the Bout Agreement).

[25] Section A, *supra*, Nos. 48-51.

[26] Hunt Memo at 7 (quoting Lesnar Bout Agreement Section 5(c)).

[27] *Id*. at 23.

1  any consequences would be determined exclusively through the ADP arbitration process (which

2  they were before this suit was filed).

3          Finally, and regardless of what the Bout Agreements say about required compliance, Hunt

4  could not have reasonably relied on them because he in fact suspected and believed that Lesnar was

5  violating the ADP. Hunt even admits in the Declaration he swore out just for this motion that, "[t]he

6  late announcement of Lesnar's return to the UFC, coupled with the drug testing exemption, *led me*

7  *to suspect that UFC/White could be attempting to give Lesnar time to get PEDs out of his system*

8  *prior to testing*."[28] And prior to UFC 200 Hunt repeatedly and emphatically accused Lesnar of

9  "juicing," but proclaimed privately, publicly, and repeatedly that it "doesn't matter," that he "don't

10 care," and that he would knock Lesnar out anyway. Those admissions are the antithesis of

11 justifiable reliance, and they entirely undercut Hunt's post hoc fabricated claim that he in any way

12 relied on the Bout Agreement as assurance Lesnar would not violate the UFC ADP. *Collins v.*

13 *Burns*, 103 Nev. 394, 397, 741 P.2d 819, 821 (1987) ("The test is whether the recipient has

14 information which would serve as a danger signal and a red light to any normal person of his

15 intelligence and experience.").

16          Because the facts are not in dispute, and because even when viewed in the light most

17 favorable to Hunt they do not come close to meeting the clear and convincing standard of proof that

18 Lesnar made a false representation to him or anyone else on which he could justifiably have relied,

19 his fraud claim fails as matter of law and must be dismissed. *E.g., See Saticoy Bay, LLC Series*

20 *Innisbrook v. Thornburg Mort. Secs. Trust 2007-3*, 510 P.3d 139, 143-44 (Nev. 2022) (affirming

21 summary judgment on a fraud claim where the plaintiff failed to prove a false representation or

22 material omission); *Pac. Maxon, Inc. v. Wilson*, 619 P.2d 816, 817 (Nev. 1980) (lack of justifiable

23 reliance bars recovery in an action at law for damages for the tort of deceit) (*citing Lubbe v. Barba*,

24 540 P.2d 115 (Nev. 1975)).

25

26

27

28

---

[28] Hunt SJ Ex. 5 (Hunt February 2, 2023, Decl., ¶ Par. 4) (italics added).

**B.   LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S EIGHTH CAUSE OF ACTION FOR COMMON LAW BATTERY.**

The undisputed facts show that Hunt unequivocally and without reservation consented to fight Lesnar—whether "doping" or not—and that he expressly and as a matter of law assumed the risk of any resulting harm. His arguments to the contrary are based on a misreading of the Ninth Circuit's opinion in this case (decided under the standards governing motions to dismiss), a misunderstanding of his burden to prove lack of consent (which is an essential element of his claim), and conflation of the consent element of a battery tort with the concepts of express and primary assumption of the risk (which excuse the ordinary duty of care to prevent injury from risks knowingly accepted).

**1.   Hunt's Battery Claim is Barred by his Unequivocal Consent.**

Hunt agrees that lack of consent is an essential element of a battery tort. Hunt Memo at 17. *See also Hunt v. Zuffa, LLC*, 2021 WL 4355728 at *3, n.5 (". . . lack of consent is an essential element of a battery claim.") (*citing Prell Hotel Corp. v. Antonucci*, 469 P.2d 399, 401 (Nev. 1970) (holding that if a plaintiff consents through words and actions to an assault and battery, the defendant cannot be held liable)). Because he has not met and cannot meet his burden to prove that he did not consent to fight a "doping" opponent, his battery claim fails.

In short, Hunt had a long history of facing "doping" fighters, knew that "doping" was an issue in the UFC, and suspected and accused Lesnar of "doping." Because he did, Hunt asked White to make sure Lesnar gets tested; but at the same time told him it "doesn't matter." When White responded that Lesnar would be tested and that USADA was "all over him," Hunt replied, "no problem," and then agreed to fight Lesnar still believing that he was "juiced to the gills" and without demanding or receiving any oral or written assurance from White or anyone else that he was not.[29]

---

[29] There is no dispute that Lesnar was tested nine times—with seven negative results in a row before the scheduled fight. And there is no evidence that Lesnar intentionally or knowingly ingested any banned substance, that any of Lesnar, White or UFC knew the last two samples would test positive, or that any of them in any way controlled, manipulated, or delayed the test results.

1    Hunt nevertheless argues that he made "repeated desperate pleas to White to ensure that

2    Lesnar was properly drug tested," and that he "relied on White's word, the PARA, the UFC 200

3    Bout Agreement, the rules and regulations of the UFC generally, and Nevada law," all of which his

4    counsel claims to evidence his "steadfast *refusal* to consent to fight a doping fighter." Hunt Memo

5    at 19. But Hunt's text messages to White were punctuated with grinning, winking, and laughing-

6    while-crying emojis—the exact opposite of a "desperate plea" or "steadfast refusal to fight"—the

7    PARA and Bout Agreements each contain integration clauses that expressly disclaim any other oral

8    or written agreements and include Hunt's consent to all foreseeable and unforeseeable risks

9    associated with professional MMA fighting, and the UFC ADP and Nevada law do nothing more

10   than prescribe consequences for a fighter who violates the rules. As to the consequences of a rules

11   violation—which is really what this is all about—there is no dispute that Lesnar's win over Hunt

12   was changed to a "no contest," and that he was suspended from competition and fined.

13   Hunt similarly offers his unsupported conclusion that consenting to fight a "clean" fighter is

14   not the same as consenting to fight one who is "supercharged" with "enhanced strength, speed,

15   agility and stamina due to the effects of doping." Hunt Memo at 18 (*citing* Israetel Supp. Report,

16   Hunt SJ Ex. 10). While in the abstract that may be true, the argument is not valid here because there

17   is no evidence to support either the underlying premise that Lesnar was using steroids or the

18   exaggerated assertion that he was "supercharged," and in making those claims Hunt misstates and

19   deliberately misrepresents the report of his pseudo expert—who admittedly made no determination

20   as to whether Lesnar actually received any benefit from the non-steroid substance for which he

21   tested positive and had no factual basis upon which to make any such determination. *See id*.

22   As to the qualifications of Hunt's "steroid" expert, Dr. Israetel was asked to assume for

23   purposes of his analysis in this case that Lesnar was using steroids (which he was not), and to

24   comment generally on how steroids would affect anyone who had taken them in preparation for a

25   mixed martial arts fight (not Lesnar specifically). Olsen 2nd Decl., **EX Q**, Israetel Tr. 45:4-45:25;

26   51:3-51:8. Consequently, Dr. Israetel did not offer any opinion in terms of the amounts or

27   significance of the non-steroid substance which actually triggered Lesnar's adverse test results, nor

28   did he have an explanation for why Lesnar's June 6, 8, and 15, 2016, test samples were negative or

1   why Lesnar never tested positive for steroids. *Id.*, Tr. 47:14-47:21, 60:4-61:2, and 61:14-62:7.

2   Because he did not offer any opinion as to the specific effect on Lesnar of the non-steroid substance

3   that triggered his adverse analytical finding, and because there is no evidence that Lesnar was using

4   steroids, the opinions Dr. Israetel offers about the performance enhancing benefits of steroids in

5   general are neither relevant nor admissible. *See* Fed. R. Evid. 702(a) (expert testimony allowed only

6   if it will help the trier of fact to determine a fact in issue and reliably applies reliable principles and

7   methods to the facts of the case); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.

8   2011) (*Daubert* "requires a court to admit or exclude evidence based on its scientific reliability and

9   relevance."); *Morrison v. Quest Diagnostics, Inc.*, Case No. 2:14-cv-01207-RFB-PAL, 2016 WL

10  3457725, at *4 (D. Nev. June 23, 2016) ("[E]xpert opinion should be excluded when it is based on

11  assumptions which are speculative and not supported by the record.").[30]

12          Disregarding the irrelevant and inadmissible side show that is the Israetel Report, as this

13  Court should, the only conclusions that can be drawn from the undisputed facts are that it was

14  reasonably foreseeable to Hunt that any MMA competitor may be found to be in violation of the

15  UFC ADP at any time, and that he unequivocally consented to fight Lesnar—whom he suspected

16  and accused of "doping." *See, e.g.*, *State v. Shelley*, 85 Wash. App. 24, 26, 929 P.2d 489, 490

17  (1997) ("[W]e hold that the consent defense is not limited to conduct within the rules of the games,

18  rather it is to the conduct and harm that are the reasonably foreseeable hazards of joint participation

19  in an athletic contest."). Because Hunt cannot meet his burden to prove that he did not consent to

20  face a potentially "doping" competitor, his battery claim fails as a matter of law and Lesnar is

21  entitled to judgment in his favor.[31]

22

23

24

25

---

26  [30] Somewhat ironically, Dr. Israetel admitted in his deposition to regularly using steroids that he

27  obtained in violation of the Federal Controlled Substances Act over an eleven-year period, and
    when questioned further on the subject invoked his Fifth Amendment right to be free from

28  compelled self-incrimination. Olsen 2nd Decl., **EX Q**, Israetel Tr. 68:24-73:10.
    [31] *See also* n. 20, *supra* (Lesnar adoption of UFC's arguments on the damages issues).

1

2       **2.**     **Hunt's Battery Claim is Barred by His Express and Primary Assumption of the Risk.**

3       This Court need consider whether Hunt expressly or as a matter of law assumed the risk of

4 all harm that may result from competing against a "doping" fighter only if it first rules that Hunt's

5 battery claim is not barred by his consent—which it unquestionably is. Should the Court choose to

6 address the issue, it should conclude for the following reasons that Hunt's battery claim is also

7 barred by his express and implied assumption of the risk. *See Burnett v. Tufguy Prods., Inc*., No.

8 2:08-CV-01335-GMN, 2010 WL 4282116, at \*4 (D. Nev. Oct. 20, 2010) ("[I]n Nevada, the issue of

9 assumption of the risk is a question for the court, not a jury.") (*citing Turner v. Mandalay Sports

10 Entm't LLC*, 180 P.3d 1172, 1177 (Nev.2008)).

             **(a)**     **Hunt Expressly Assumed the Risk.**

11       Express assumption of risk is "essentially a contract where the plaintiff signs a document

12 and openly agrees to hold the defendant harmless for known and inherent dangers of a particular

13 activity." *Aukenthanler v. Grundmeyer*, 877 P.2d 1039, 1040 (Nev. 1994). For a party to assume the

14 risk there are two requirements: "First, there must have been voluntary exposure to the danger.

15 Second, there must have been actual knowledge of the risk assumed." *Kuchta v. Sheltie Opco, LLC*,

16 466 P.3d 543, 2020 WL 3868434 at \*3 (Nev. App. 2020) (unpublished disposition) ("Actual

17 knowledge of the danger by the party alleged to have assumed the risk is the essence of the express

18 assumption of risk doctrine").[32] Both requirements are satisfied here.

19       Trying to evade the logical conclusion which follows from his admitted knowledge,

20 statements, and actions, Hunt presents an illogical, extreme hypothetical which posits that if he

21 could be found by signing the PARA and Bout Agreement to have expressly assumed the risk of

22 any "foreseen or unforeseen" violation of the rules by his opponent, like "doping," then Lesnar must

23

24

25 ----

26 [32] At Hunt Memo n. 92 he cites to cases from other jurisdictions for the proposition that assumption of the risk is not a defense to an intentional tort, many of which cases were decided based upon comparative and contributory negligence principles that differ from Nevada law, and none of which

27 are controlling here. *Cf. Jaross v. Phillips*, No. 2:10-CV-01631-PMP, 2011 WL 3471865, at \*8–9 (D. Nev. Aug. 9, 2011) (". . . no duty is owed for risks inherent to the activity . . . individuals ought

28 to be able to participate in sports . . . without fear of being held liable for a risk that is inherent in the nature of the sport.").

also take the position that "he could have stepped into the Octagon with a gun and shot Hunt, and Hunt would have no recourse whatsoever because he consented to any unforeseen risk." But that hypothetical misses one important point, which is that Hunt admits "doping" to be a known risk within the normal scope of organized MMA activity, just like other frequent rules infractions, whereas being shot by a bullet fired from a gun is not.

All of the uncontroverted evidence shows that Hunt well knows "doping" is an issue in MMA, but he did not hesitate to sign the PARA and Bout Agreement, both of which include broad waivers regarding any harm that may result from foreseen and unforeseen risks associated with participation in a professional UFC fight and neither of which contain any exception for the known risk that an opponent may be found in violation of the rules prohibiting "doping." Add to that the undisputed facts that Hunt suspected and accused Lesnar of violating the UFC ADP before signing the Bout Agreement, said that it "doesn't matter" and that he would fight him anyway, and never withdrew from the fight despite his stated beliefs, the only legal conclusion that can be drawn is that Hunt expressly assumed the risk of being matched up with a fighter who may test positive for a substance banned by the UFC ADP. Because Hunt voluntarily exposed himself to a known risk, which he expressly waived, his battery claim fails as a matter of law.

### (b)      Hunt is Deemed to Have Primarily Assumed the Risk.

Primary assumption of risk arises when "the plaintiff impliedly assumes those risks that are inherent in a particular activity." *Turner,* 180 P.3d at 1177. When remanding Hunt's battery claim for further proceedings in this case the Ninth Circuit commented on how consent is analyzed differently from assumption of risk, but the opinion did not go on to fully examine the intricacies of those doctrines because dismissal of Hunt's battery claims "would not [in any event] be appropriate at the pleadings stage." *Hunt v. Zuffa, LLC*, 2021 WL 4355728 at *3 and n.6 (distinguishing the California Supreme Court's application of assumption of risk principles in the sporting context because it "was predicated on a factual finding that intentional beaning is within the range of ordinary baseball activity," but "[h]ere [at the pleadings stage] there has been no similar conclusion that doping is within the normal scope of organized MMA activity, nor does the question appear to

1    be beyond reasonable dispute.").[33] Unlike the record that was earlier before the Ninth Circuit on

2    review of motion to dismiss, however, discovery has now been completed, the facts are not in

3    dispute, and there is no longer any question as to whether "doping," although a rules infraction, is

4    unfortunately within the normal scope of MMA.

5            As explained in more detail above, and among other things, Hunt admits that "doping" was

6    an issue in the UFC, his prior UFC opponents were found to have been in violation of the UFC

7    ADP, he was promoted to the main event at UFC 200 only because another competitor had just

8    been disqualified for "doping," and before signing the Bout Agreement he suspected and believed

9    Lesnar was "doping." Hunt also admits in his opposition memorandum that that he "suspected from

10   the beginning" that Lesnar was using PEDs, and that "it is the rampant use of prohibited substances

11   that has caused a . . . fundamental change to the nature of MMA." Hunt Memo at 3, 21-22. The only

12   conclusions that can follow from these undisputed facts are that "doping" is a risk inherent in the

13   sport of MMA, and that Hunt impliedly assumed the risk of any harm that may result from being

14   paired with an opponent who tests positive for a substance banned by the UFC ADP.

15           Because he cannot avoid the admitted and undisputed facts, Hunt argues instead that "there

16   is no reason which the assumption of the risk doctrine should protect activity that is . . . forbidden

17   by the rules of the sport." Hunt Memo at 21. But if that were true, anyone injured in any sport by a

18   participant who violated a rule of the sport could be held liable in a court of law: the hockey player

19   who delivered an illegal body check (a risk inherent in the sport that results in a 2 or 5 minute

20   penalty) could be sued for any resulting injury to his opponent; the basketball player who fouled an

21   opponent under the basket (a risk inherent in the sport that results in a foul shot) would have to fear

22   civil liability; the football player who tackled the quarterback after he let go of the ball (a risk

23   inherent in the sport that results in a loss of yardage) could expect to receive a summons; and any

24   MMA participant who tested positive for any one of the hundreds of substances banned by the UFC

25   ADP (a risk inherent in the sport that results in disqualification) could be forced to spend tens of

26

27

28   [33] *See Avila v. Citrus Comm. Coll. Dist.*, 131 P.3d 383, 395 (Cal. 2006) (holding that even though a baseball pitch directed at the batter violates the rules of the game, the batter voluntarily assumed the risk).

1   thousands of dollars to defend a suit like this one. *Cf.  Rodrigo v. Koryo Martial Arts*, 100 Cal. App.

2   4th 946, 958-59 (2002) (noting the recognized "possibility that a [sports] participant will act

3   negligently or break a rule of the sport in the heat of competition.").

4        In the end, what the primary assumption of risk issue comes down to this: as with the

5   baseball player in *Avila* who assumes the risk of being "beaned" by a pitcher (a blatant rule

6   violation), the fact that MMA competitors may test positive for a substance prohibited by the ADP

7   (also a rule violation) is, for better or worse, a risk inherent in the sport that is known to and

8   assumed by all who step into the fighting cage. Because there is no question that it was not

9   uncommon for competitors to violate UFC ADP rules, and Hunt in particular suspected and

10  believed Lesnar was "juicing" but agreed to fight him anyway, as a matter of law he impliedly

11  assumed the risk of any harm that may result from facing a "doping" competitor, his battery claim

12  fails as a matter of law, and Lesnar is entitled to Judgment in his favor.

13  **C.   LESNAR IS ENTITLED TO SUMMARY JUDGMENT ON HUNT'S FOURTH AND
14       TENTH CAUSES OF ACTION FOR CIVIL AIDING AND ABETTING AND
          CONSPIRACY.**

15        Hunt concedes that if his underlying claims for fraud and battery are dismissed, his

16  conspiracy and aiding and abetting claims must be dismissed as well. Hunt Memo at 24-25.

17                              **CONCLUSION**

18        For all of the foregoing reasons, the court should enter judgment in Lesnar's favor and

19  against Hunt dismissing his Third, Fourth, Eighth and Tenth Causes of Action on their merits and

20  with prejudice.

21

22

23

24

25

26

27

28

1    DATED this 17ᵗʰ day of February 2023.

2                                          HENSON EFRON, P.A.

3

4                                          By */s/ David Bradley Olsen*
                                               David Bradley Olsen (MN No. 197944)
5                                              225 South Sixth Street, Suite 1600
                                               Minneapolis, Minnesota 55402
6                                              Telephone: (612) 339-2500

7
                                               -and-
8
                                               LAW OFFICES OF HOWARD L. JACOBS
9                                              Howard L. Jacobs (CA No. 149709)
                                               2815 Townsgate Road, Suite 200
10                                             Westlake Village, California 91361
                                               Telephone: (805) 418-9892
11
                                               -and-
12

13                                             CHRISTIANSEN LAW OFFICES
                                               Peter S. Christiansen (NV No. 5254)
14                                             Kendelee L. Works (NV No. 9611)
                                               710 S. Seventh Street, Suite B
15                                             Las Vegas, Nevada 89101
                                               Telephone: (702) 240-7979
16

17                                             *Attorneys for Separate Defendant Brock Lesnar*

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Federal Rule of Civil Procedure 5 and the Court's Local Rules, the undersigned hereby certifies that on this day, February 17, 2023, a copy of the foregoing document entitled **SEPARATE DEFENDANT BROCK LESNAR'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed and served through the Court's electronic filing system (CM/ECF) upon all registered parties and their counsel.

_/s/ Nina Adelson_
An employee of Henson Efron